# Turner *et al.* *v.* City of Mobile.

*Bill in Equity to enjoin Action of Ejectment and to prevent Multiplicity of Suits.*

1. *Equity jurisdiction; what necessary to maintain bill to prevent multiplicity of suits.*—The ' prevention of a multiplicity of suits is not, considered by itself alone, an independent source or occasion of equity jurisdiction, in such sense that it can create a cause of action, when one does not otherwise exist; and before a party or parties can invoke the jurisdiction of chancery to prevent a multiplicity of suits, such party or parties must have some prior legal or equitable rights in the premises. It can not be invoked at all for the mere prevention of a multiplicity of suits, by bringing into one litigation num-

[Turner *et al.* v. City of Mobile.]

erous pending or imminent actions by a party who is without cause of action or ground of defense.

2. *Same; same.*—To authorize numerous persons, or one person for himself, or for himself and others, to maintain a bill for the prevention of a multiplicity of suits, there must be a common title, or a common interest, in the subject matter involved; and a mere common interest in the question of law involved in the pending or threatened suits, is not sufficient to authorize the exercise of equity jurisdiction for such purpose.

3. *Same; same.*—Where numerous actions at law are brought by the same party plaintiff against separate and distinct parties defendant, a court of chancery will not exercise its jurisdiction for the purpose of consolidating such actions and thereby preventing a multiplicity of suits, when no common property right or franchise is held by such numerous parties defendant, and when only one suit is pending, or threatened, against each, and no one of them could be injured by the multiplicity of actions in which other persons only would be parties, though the right of defense of such persons relied upon by each of such parties defendant, is the same, or is dependent upon the same state of facts.

4. *Same; same.*—Where a single party has instituted several actions of ejectment against separate and different parties defendant for the recovery from each separately of distinct lots or parcels of land, the facts that the claims of title on the part of the party plaintiff is the same in each of said several suits, and that the attitudes and rights of the defendants in each of said actions are the same or similar, and, therefore, each of the defendants in said suits has an interest in common with all the others in the questions of law and fact involved in said actions, are not sufficient to authorize the maintenance of a bill by the defendant in one of the actions of ejectment, either in his own behalf alone, or in behalf of himself and the defendants in the other ejectment suits, to enjoin all the actions of ejectment and thereby prevent a multiplicity of suits.

5. *Same; what necessary to authorize maintenance of bill in equity.* A party who seeks to go into equity to obtain relief must himself have equity; and, therefore, where the title relied on by the party defendant in an action of ejectment is legal, where his defense is at law, and all his rights, remedies and defenses are cognizable in a legal forum, he can not maintain a bill to enjoin other actions of ejectment, brought by the same plaintiff against different parties, and thereby prevent a multipli-

[Turner *et al.* v. City of Mobile.]

city of suits, upon the theory that the court has an equity, or upon the ground that the several defendants in the other suits have like but entirely independent and disconnected legal rights, estates or defenses.

6. *Rights of riparian or littoral owners; when parol license to erect wharves revocable; estoppel.*—A parol license granted by a shore owner to the owner of the upland abutting on the shore, to erect wharves on and across the shore, is revocable at the option of the shore owner, although the owner of the upland abutting on the shore has performed acts thereunder or has expended money in reliance thereon; and the fact that the license is executed, or that money has been expended by the licensee under it, does not equitably estop the shore owner or licensor from revoking the license.

7. *Taxation; estoppel as to State or city.*—The fact that statutes of this State, and ordinances of one of the cities of the State levy taxes on wharves owned and maintained by a citizen, involves no matter of equitable estoppel upon the State or said city to assert whatever legal title either may have to the shore lot on which such wharves are located.

8. *Equity jurisdiction; fact that title is held by trustee confers no equity jurisdiction.*—The mere fact that the legal title to land is in a trustee, gives no right to a disseizor to come into a court of equity to enjoin an action at law by the trustee for the recovery of possession of said land.

APPEAL from the Chancery Court of Mobile.

Heard before the Hon. THOS. H. SMITH.

The bill in this case was filed by the appellants against the city of Mobile. The bill as filed, excepting and omitting the prayer for process, the foot note and verification, was as follows:

"To the Honorable Thomas H. Smith, Chancellor for the Southwestern Chancery Division of the State of Alabama, sitting for the Thirteenth District.

"The bill of complaint of Mamie L. Turner, wife of Freeman C. Turner, and Emma B. Morris, wife of Thomas B. Morris, residents of Mobile county, Alabama, who exhibit this bill of complaint in their own behalf as well as on behalf of all others similarly situated as oratrices are in respect of the subject matter of the controversy relating to the lands lying below ordinary high tide water mark of the Mobile river, within the corporate limits of the late municipal corporation

of Mobile under its charter of 1866, against the City of Mobile, a municipal corporation in said county of Mobile, and thereupon your oratrices showeth unto your Honor:

"First. That your oratrices own as tenants in common in equal parts, or shares, the property hereinafter described in this bill, which they acquired from their father, the late William J. Hearin, deceased, who for many years next preceding his death, had owned said property and all the rights, privileges, easements, and appurtenances · thereunto belonging, or appertaining thereto. That on December 21st, 1900, the city of Mobile, the respondent to this bill, brought a statutory action in the nature of an action of ejectment against your oratrices in the . circuit court of Mobile county, Alabama, to recover possession, and one thousand dollars ($1,000) for the detention of that certain tract of land, situated in the city and county of Mobile, State of Alabama, and more particularly described as follows, to-wit: Beginning at a point at the interesection of the east line of Commerce street with the south line of Elmira street and running thence in a southerly direction along the east line of Commerce street for a distance of two hundred and twenty (220) feet and ten (10) inches to a point, thence in an easterly direction along a line parellel with Texas street, to .the channel of the Mobile river, thence in a northerly direction along the channel of the Mobile river to the point of intersection of the channel of the Mobile river with the southern boundary line of Elmira street extended, thence westwardly along the southern boundary line of Elmira street extended to the place of beginning, the same being known as lots numbered 1, 2, 3, 4 and 5 of block number 166 of a plat made by Dean Knox.

"Second. Your oratrices aver upon information and belief, and so charge, that the city of Mobile asserts that the legal title to said property is in said city of Mobile, and oratrices charge upon information and belief that the city of Mobile claims said title as follows, and not otherwise, to-wit: That the said land sued for lies between what was the ordinary high tide water at

the time Alabama was admitted into the Union as a State, and the channel of the Mobile river, a navigable tide water stream, and that prior to the admission of Alabama into the Union the title was in the United States, and that upon the admission of Alabama into the Union, the title to this land, being part of the shore of the navigable waters, became vested in the State of Alabama. That the State of Alabama granted said land to the city of Mobile, by an act of its legislature approved on January 31st, 1867, which said act is as follows, to-wit: 'An act granting to the city of Mobile the riparian rights in the river front. Section 1. Be it enacted by the Senate and House of Representatives of the State of Alabama in General Assembly convened: That the shore and soil under Mobile river, situated within the boundary lines of the city of Mobile, as defined and set forth in section two of "an act to incorporate the city of Mobile," approved February 2d, 1866, be, and the same is hereby, granted and delivered to the city of Mobile.

" 'Section 2. Be it further enacted, That the mayor, aldermen and common council of the city of Mobile be, and are hereby, created and declared trustees to hold, possess, direct, control, and manage the shore and soil herein granted, in such manner as they may deem best for the public good. Approved January 31st, 1867.' "

"That the said present city of Mobile claims to be the corporate successor of the former city of Mobile, to whom said land was granted by the said act of January 31st, 1867, and said city of Mobile claims that the absolute and unconditional title to said land was vested in it by virtue of an act of the legislature of Alabama approved February 18th, 1895, which was amended by an act approved December 5th, 1896, and which said act as amended is as follows, to-wit: 'An act to amend an act entitled "An act to fix the right of the city of Mobile to certain real estate." Approved February 18th, 1895. Section 1. Be it enacted by the General Assembly of Alabama: That an act entitled "An act to fix the right of the city of Mobile to certain real estate," approved February 18th, 1895, be,

[Turner *et al.* v. City of Mobile.]

and the same is hereby, amended so as to read as follows: Section 1. Be it enacted by the General Assembly of Alabama, that the absolute and unconditional title and right to all real estate, rights and easements, pertaining, or incidental, to any real estate, or any right therein, or thereto, heretofore vested in the mayor, aldermen and common council of the city of Mobile or in the port of Mobile, or in the present city of Mobile, or in any municipal corporation of Mobile however said corporation may have been named or called, whether held in trust, or otherwise, except such as have heretofore vested in the trustee for the holders of the bonds of the city of Mobile, is hereby vested, absolutely and unconditionally, in the city of Mobile, to be by it held, managed, controlled and disposed of, as to it may seem best.

" 'Section 2. Be it further enacted, That the said city of Mobile be, and is hereby, authorized and empowered to contract and arrange with such person or person as it may think proper upon such terms as may seem best to it, for the ascertainment, location and recovery of any part, or the whole, of such property and the rights hereby vested in it and may, if it thinks proper to do so, convey to such person or persons an interest in said property and rights, as compensation for his or their services in such matters. Approved December 5th, 1896.'

"And your oratrices, upon information and belief, charge that the said city of Mobile asserts and claims that it acquired the absolute title to said described property sued for by virtue of said acts of the legislature of the State of Alabama, and that it relies to recover in its said ejectment suit upon the facts herein set forth, and does not claim any title to said land otherwise.

"Third. Your oratrices further show unto your Honor that the legislature of Alabama passed an act which was approved February 11th, 1879, entitled 'An act to vacate and annul the charter and dissolve the corporation of the city of Mobile, and to provide for the application of the assets thereof in discharge of the debts of said corporation,' the first section of which said act is as follows, to-wit: 'Section 1. Be it enacted by the General As-

sembly of Alabama that the act entitled "An act to consolidate the several acts of incorporation of the city of Mobile, and to alter and amend the same," approved February 2d, 1866, and all acts of a date subsequent thereto altering and amending the said act, and all other acts incorporating the city of Mobile, or in conflict, or inconsistent with the provisions of this act be and the same are hereby repealed, and the corporation of the city of Mobile, known and styled as the mayor, aldermen and common council of the city of Mobile, is hereby dissolved and abolished.' The second section of said act provides for the appointment of commissioners to take possession of the property of said late municipal corporation, and the third section of said act is as follows, to-wit: 'Section 3. Be it further enacted, Said commissioners shall at once enter upon and take possession of all the property, real and personal, which, prior to the passage of this act, belonged to the mayor, aldermen and common council of the city of Mobile, and shall also have, demand, and receive and collect all the choses in action, debts, claims and demands of all kinds and of every name and nature, including all sums of money for taxes before the passage of this act lawfully assessed, levied or laid by said mayor, aldermen and common council of the city of Mobile, and which said corporation was, on said last mentioned day, entitled to have, demand, receive and collect from any person or persons, company or companies, corporation or corporations, property or properties, business, employment, or occupation whatsoever, and which were then not paid or otherwise lawfully discharged, and they shall realize and collect all said debts, claims and demands at as early a date as practicable, and apply the same and the proceeds thereof to and for the uses, purposes, and objects in this act declared; but nothing in this act contained shall be construed to vest in said commissioners any power or authority to lay or levy any tax or assessment upon any property, polls, business, or occupation, or to demand, receive, or collect any money or other thing from any person, or from any corporation, or from or out of any property, or business, except such sum or

sums of money or amounts as had been lawfully levied, assessed, or laid, or otherwise lawfully declared, by said mayor, aldermen and common council of the city of Mobile, under authority of the acts for the incorporation thereof before the date of the passage of this act, and not then paid to said corporation, or collected or otherwise discharged by the authority thereof.'

"And your oratrices aver that the said 'shore and soil under the Mobile river,' was not property of the said city of Mobile and did not pass.to said commissioners under said act of February 11th, 1879, but that the same being property of a public nature and held by said city of Mobile merely in trust for the public, as an agency of the State of Alabama, the same, immediately upon the approval of said act vacating and abolishing said municipal corporation, reverted to, and passed under, the control of the State of Alabama in all respects as it was held by the State prior to the passage of said act of January 31st, 1867.

"Fourth. Your oratrices further show that by another act approved February 11th, 1879, the legislature of Alabama incorporated a new municipal corporation under the name and style of the 'Port of Mobile,' but within a smaller area than that occupied by the former city of Mobile. By the original charter of this new municipal corporation the State of Alabama gave it no power, title, authority or jurisdiction in respect of the shore and soil under the Mobile river, but by an amendment thereto, approved December 8th, 1880, the legislature added to the said charter the following, to-wit:

" 'Section 5. Be it further enacted, That in addition to the power conferred on the aforesaid police board by said act of February 11th, 1879, it shall have power to establish and declare by ordinance, a designated line along the river fronts, within the corporate limits of the port of Mobile beyond which wharves or other structures shall not be erected or extended, after the passage of said ordinance; provided, however, that such ordinances shall not affect any wharves or constructions already established. It shall also have power to determine and declare, by ordinance, to what extent, and in what man-

ner, wharves, or other constructions along said river fronts, shall be built or erected, and when and with what kind of material the same may be filled in.'

"That acting under said amendment to its charter the police board of said port of Mobile, to-wit, in the year 1882, adopted ordinances, designating and defining channel or wharf lines along both sides of said Mobile river, and in and by the ordinances designating the line along the eastern side of the river it is ordained as follows, to-wit: 'That from and after the passage of this ordinance it shall not be lawful to construct any wharf within the limits of the city of Mobile on the east bank of Mobile river which shall extend into the channel of Mobile river beyond the following line, to-wit' giving the line established as a channel or wharf line, along the eastern shore of the river. And in the ordinance designating the channel line along the western shore of said river it is ordained as follows, to-wit: 'That from and after the passage of this ordinance it shall not be lawful to construct any wharf within the limits of the city of Mobile which shall extend into the channel of the Mobile river beyond the following line, to-wit:' giving the western channel line.

"And said 'Mobile police board of the port of Mobile,' further ordained as follows, to-wit: 'Be it further ordained, that before beginning to construct or extend any wharf within the limits of the city of Mobile the person or persons proposing to construct or extend the same shall first obtain a permit therefor from the civil engineer of the city, in which shall be accurately given the lines established by the first section of this ordinance, and the wharf when constructed shall neither extend beyond nor fall short of said lines, and if application be made to construct a solid wharf, at least forty feet of the outward end thereof shall be required to be left open.'

" 'Be it further ordained, that where a wharf has been heretofore constructed which does not extend to the line hereinbefore established, upon its becoming necessary to renew the piling thereof, or make other extensive repairs thereon, a permit therefor shall first be obtained

6c

from the civil engineer of the city, in which shall be given the line hereinbefore established, and the owner or owners of such wharf shall then be required to extend the same to the line as established, leaving forty feet thereof open at the end, and no wharf constructed prior to the passage of this ordinance, and having the end thereof upon for forty feet, shall hereafter be filled in.'

" 'Be it further ordained, that no wharf shall be filled in either with ballast or other material unless in front of the same there be erected a permanent and tight bulkhead well anchored and secured so as to prevent the material behind the bulk from falling into the river and all such bulk-heads shall be approved by the city engineer, and no ballast or filling in shall be allowed until approved by the city engineer, who shall give his certificate after examining the same, if found satisfactory.'

"Fifth. Your oratrices further show that afterwards, on, to-wit, December 10th, 1886, the legislature of Alabama amended the said charter of the port of Mobile, and changed its corporate name to the 'City of Mobile,' and by section 22 of said amended charter it is enacted as follows, to-wit: 'Section 22. Be it further enacted, that the general council shall have power to establish and declare by ordinance a designated line along the river fronts, within the corporate limits of the city of Mobile beyond which wharves or other constructions shall not be erected or extended after the passage of said ordinance, unless the legislature has created, or shall create, an harbor or dock commission, clothed with the power of regulating wharf and boom lines in that portion of Mobile river, in which case the power of the general council in the premises shall be suspended so long as said commission is clothed with such power. Provided, however, that such ordinances shall not affect any wharves or construcions already established. It shall also have power to determine and declare, by ordinance, to what extent, and in what manner, wharves or other constructions along said river fronts shall be built or erected and when and with what kind of material the same may be filled in.'

"Your oratrices further show that on, to-wit, February 28th, 1887, an act of the legislature of Alabama was approved entitled 'An act to establish a river commission for Mobile river and branches, and to define its powers,' which was amended by an act approved February 28th, 1889. And your oratrices herein set out the following sections of said act, to-wit:

" 'Section 1. Be it enacted by the General Assembly of Alabama, that the mayor of Mobile, the president of the board of revenue and road commissioners of Mobile county, or of any revenue board for said county by whatsoever name it shall be known, if any, which shall hereafter by law succeed the said board of revenue and road commissioners, the president of the Mobile chamber of commence, and their successors in office *virtute officii*, and a lawyer of not less than ten years' standing at the bar of Mobile, to be appointed by the Governor every four years, commencing January 1st, 1887, and a citizen of the county of Mobile of not less than ten years residence therein, who shall not be a practicing attorney, to be appointed by the Governor every four years, beginning January 1, 1889, be and the same are hereby constitute l a body politic, under the name and style of "The Mobile River Commission," with the power and duty to provide a corporate seal for the authentication of all its official acts; provided, that the lawyer appointed on said commission shall not be employed to prosecute or defend any suit brought by or against said commission.'

" 'Section 4. Be it further enacted, that the jurisdiction of said commission shall extend over the Mobile and Tensas rivers, from a point one hundred yards above the head of Tensas river to a line in Mobile bay, running east and west through the light house at the mouth of Mobile river and over all tributaries and cuts off of said rivers as far up as tide water extends, including Spanish and Middle rivers, and including the water front of the city of Mobile; and within the said limits of the east bank of Tensas river, the west bank of Mobile river, and the east and west line near the mouth of Mobile river, and within the tide water of such tributaries, it shall be the duty of the said Mobile river commission to establish from time to time as may appear to said commission neces-

sary for the protection of the navigability of said waters and the integrity of Mobile harbor and its improvements, bulk-heads, wharf, dry dock, and boom lines, and lines for similar structures, and it shall be unlawful for any person to build or maintain a bulk-head, wharf, boom, dry dock, or similar structure, as the case may be, otherwise than in conformity with the lines so established, or in manner and form contrary to the regulations established by the said commission; and said commission is hereby authorized to have all or any portion of the waters embraced within its jurisdiction properly surveyed and sounded, and maps thereof made for filing in its office for its information, the expenses of which shall be charged to Mobile county, and paid as hereinafter provided.'

" Section 8. Be it further enacted, that no one shall erect or place any bulk-head, wharf, boom, dry dock, or similar structure in any of the waters mentioned in the fourth section of this act, without first making an applition in writing to the said commission, which application shall describe the nature and exact location of such proposed structure, giving specifications, and shall be accompanied by a diagram giving the exact plan thereof as well as of the shore on both sides of the river or stream on which the same is located, for a distance of at least one hundred yards above and below the proposed structure, and when in municipal limits a distance back to the first street parallel to said river, which plan shall be drawn with India or other equally durable ink on durable drawing paper on a scale of fifty feet to the inch, and shall show the names of the riparian proprietors on both sides of the river opposite said structure, where known; and said petition and map shall contain such other information as may be required by said commission, and shall be sworn to; and said commission may examine on oath the applicant and such witnesses as may be produced before it for the purpose of establishing the line, and any wilful false swearing shall be perjury. Said petitioner shall, at the time of filing his application, deposit with the city clerk the sum of fifteen cents per foot for each lineal foot of the proposed boom, and

twenty-five cents per foot for each lineal foot of wharf, bulk-head, dry dock, or similar structure, to be measured along the line of its longest dimension; provided, that when a bulk-head and wharf line are sought to be established for the same wharf or structure, only one fee shall be charged, which shall be calculated on the line having the longest dimensions. And said commission shall not entertain such petition until such fees are paid, but in case the application is declined and the structure is abandoned, one-half of said fees shall be returned to the applicant on filing with said commission written notice of such abandonment.

" 'Section 9. Be it further enacted, that it shall be the duty of all persons maintaining at the passage of this act any wharf, boom, or dry dock, or similar structure in any of the waters mentioned in section four, within ninety days after the first publication of notice of the passage of this act, and of the requirements of this section, in a newspaper published in Mobile, to file with the said commission for its approval an exact description and plan of such structure as prescribed in the foregoing section for future built structures, unless on application in writing said commission may by an order duly entered on its minutes extend such time in any particular case, and in case the owner or proper agent of such owner shall fail to comply with the requirements of this section, the said commission may have a survey and proper description and plan thereof made at the expense of such owner by a competent person, and the said commission shall bring an action in its own name in a court of competent jurisdiction to recover of such owner as a penalty, double the cost of such survey, description and plan, and the amount so sought to be recovered shall be a lien on the property of such owner from the commencement of such action, and when recovered shall be paid into the county treasury of Mobile county. And in case the owner of said property be not known or be a non-resident, then the proceeding may be *in rem* against said property in the nature of an attachment suit, and the said property be levied upon as in attachment suits, and notice thereof shall be given and all other proceedings shall thereafter be had as is or may

be provided by law for attachment suits against non-residents, but no attachment bond shall be required of said commission. And if said commission disapprove any such structure in whole or in part, the same shall be considered and held *prima facie* a nuisance to the extent of such disapproval, which action of the commission shall be duly entered on the minutes of said commission, and the owner or maintainer of said nuisance shall remove the same within thirty days after notice thereof, or otherwise conform to the requirements of said commission, and in default thereof shall be subject to the proceedings and pains and penalties mentioned in sections five and six of this act.

" "Section 10. Be it further enacted, that upon the filing of any application for the privilege of erecting, altering, or maintaining any wharf, bulk-head, boom, or dry dork or other similar structure, as provided in previous sections of this act, it shall be the duty of the said commission to carefully examine the plan and specifications furnished them by the applicant, and they may take testimony as to any fact pertaining to said structure or its effect upon the navigation of such stream, and shall, if not otherwise accurately informed, have a survey made by a competent engineer of the place or portion of the river which it is proposed said structure shall occupy, and said engineer shall take sufficient soundings to show the depth of water along the line and within the inclosure of such bulk-head, wharf or boom lines or within the area to be covered by such dock; and permanent record shall be made thereof, with the date of such measurement; and in case any such application is granted, it shall be the duty of such commission to have the said lines or area accurately defined by the city or other competent engineer by stakes or other signs for the guidance of said applicant, if desired by him, and at his expense; and when such structure is finished, survey thereof shall be had by the city or other engineer employed by such commission, who shall report to said commission, and if such structure conforms to the requirements of said commission, a certificate of such facts shall be furnished to said commission and a rec-

ord thereof shall be made in the books of records of said commission. It shall be the duty of such applicant to furnish free transportation to and from the location of any structure, to said engineer and his necessary assistants acting in the performance of any duty required by this section, or to the commission or any authorized committee thereof, if they desire to personally inspect such location or work. The said engineer shall receive for his services such compensation as may be agreed upon between the said commission and himself, not to exceed ten dollars for each day, or fraction of a day, for his own services, and not exceeding two dollars and fifty cents per day for each assistant necessarily employed by him, to be paid by the county wherein said structure is located as hereinafter provided, and said commission may send the city or other engineer to inspect any locality, for the purpose of ascertaining whether any nuisance has been or is being erected or maintained in any navigable water within its jurisdiction, and to make report thereof. And it shall be the duty of the city engineer, whenever the existence of any such nuisances shall become known to him to report the same of his own motion, and all necessary expense authorized by such commission for the purpose aforesaid, shall be paid by the county of Mobile, as elsewhere provided in this act.'

" 'Section 15  Be it further enacted, That all laws and parts of laws in conflict with the provisions of this act be and the same are hereby repealed, and that this act shall take effect thirty days after the date of its approval.'

"And your oratrices aver that said Mobile river commission have, ever since its organization under the said act of 1887, and are now, exercising jurisdiction over the water and shore of Mobile river, under the provisions of said act, and the amendments thereto.

"Sixth.  Your oratrices further aver and charge that they and those under whose right and title they claim the said property sued for, have been in the actual possession of the said property for more than ten years before December 21st, 1900, claiming the same as their own.  And upon information and belief, oratrices show that at the time Alabama was admitted into the Union

the ordinary high tide water mark of said Mobile river reached to a line about fifty feet east of the line called in said complaint as Commerce street, but that on January 31st, 1867, the water had receded 'and submerged land reclaimed and filled in and made firm, that at that time there was a space of, to-wit, two hundred feet and more of firm land between said Commerce street and the then ordinary high tide water mark of said Mobile river.

"Your oratrices further show that the said land sued for is embraced within the bounds of a tract of land called the Bernoudy tract, which was confirmed to Regis Bernoudy by the United States by act of congress, approved March 3d, 1819, on a claim founded on private conveyance which had passed through the office of the Spanish commandant, and founded, as the said claimant supposed, on a grant from the king of Spain, which had been lost by time or accident. Said grant was made March 3, 1792, to one Jose Gaspar Minora, who conveyed the said land to said Regis Bernoudy on March 24th, 1813. The river boundary of said Bernoudy tract as claimed by said Bernoudy and confirmed by said act of congress and also by the treaty between the United States and the king of Spain made in February, 1819, is as follows, to-wit: 'fifteen arpens of land front on the eastern side of the river and on the river and marshy lands, with forty deep to the west,' the said river therein referred to being the Mobile river aforesaid.

"And oratrices aver that by mesne conveyances, wills, and descent the title to the land in suit passed from said Bernoudy to your oratrices. And your oratrices further charge that before any improvements were made on said land, it, with much of the land immediately adjoining it on the west, was marsh land, and useless and possessed no value except the value of the access over and across it to the Mobile river, and other littoral and riparian rights. And your oratrices further charge that to make said land and the land immediately west thereof useful and of any practical value, and to obtain access over the same to the actual navigable water of the Mobile river in front of said land, it was necessary to fill in and reclaim said land. And your oratrices fur-

ther charge that they and those under whom they claim
have, at great expense, of, to-wit, ($10,000) ten thousand
dollars, filled in and reclaimed the marsh lands west
of the ordinary high tide water mark, as well as the
land lying east thereof, which was subject to the ebb and
flow of the tide, and have erected a permanent and valu-
able wharf and bulk-head fronting on the channel of
the Mobile river upon the land sued for by said defend-
ant. That these improvements were made under and by
virtue of, and in reliance upon the invitation, license
and franchise granted by the State of Alabama and the
city of Mobile in the several acts and ordinances afore-
said, and in compliance with the requirements thereof.
And your oratrices further charge that if the said city
of Mobile has the legal title to said land, it is in equity
estopped from now asserting the same against oratrices,
and from claiming said land, and from disturbing your
oratrices in their possession thereof.

"Seventh. Your oratrices have been advised and in-
formed, and they believe, and upon such advice, informa-
tion and belief they aver and show unto your Honor
that if the said act of January 31st, 1867, set out in the
second paragraph of the bill, had effect and operation
to vest in the said municipal corporation called the city
of Mobile, created by the legislature of Alabama in 1866,
title to the said shore and the soil under Mobile river,
mentioned in said act, in trust for the public, that the
grant made by said act was repealed, revoked and an-
nulled and all the title, trust and power which by said
act was vested in said city of Mobile was divested out
of said city and reinvested in the State of Alabama by
virtue of the subsequent acts of the legislature of the
State of Alabama hereinbefore set forth.

"And your oratrices further show and charge, upon
like advice, information and belief, that if the said act of
February 18th, 1895, as amended by the act of Decem-
ber 5th, 1896, embraces and includes the shore and the
soil under Mobile river, and all the rights and easements
appurtenant or appertaining thereto, which your ora-
trices deny, that then said act, and the grant attempted
to be made to the city of Mobile is, as to your oratrices
and their property rights, secured in the manner here-

inbefore set out, in violation of the constitution of the United States, to-wit, section ten (10) of Article one (1) and the 14th amendment thereto, and said State of Alabama had not the power to make such grant to said city of Mobile and thereby deprive your oratrices of their rights to the improvements so made from their upland abutting on the waters of said Mobile river in front of their said upland, and of access over said improvements to the navigable waters of said river, and of their right to the wharf built out by them from their upland, over and across the said shore of said river to the navigable water of said river. Your oratrices further aver that they, as owners of the upland, have a right of access from their upland to the navigable portion of said Mobile river in front of their said upland, and to the wharf built out thereto, subject to such reasonable regulations as the State of Alabama may prescribe, which said right is a property right secured to them by the common law of this State as well as by the constitution and statute laws thereof, and also secured to them by the constitution of the United States. Your oratrices, however, charge upon information, advice and belief, that said act of 1895 as amended by the act of 1896, does not embrace the shore and soil of Mobile river, and is not a grant by the State of Alabama to the city of Mobile of such shore and soil.

"Eighth. Your oratrices further show that the said city of Mobile has brought numerous other actions of ejectment, to-wit, thirty or more, against divers other parties arising out of and upon the same claim of title as that under which it claims in its said suits brought against your oratrices, to-wit: Its claim of title under the aforesaid act of the legislature of Alabama, approved January 31st, 1867, and the said act of February 18th, 1895, as amended by the said act of December 5th, 1896, · and it is threatening to bring still other suits upon the same title against other persons to recover other portions of the shore of Mobile river and the wharves and other structures built thereon out to the channel line of said river. And your oratrices charge that the principal defense to all such suits of ejectment is one common to

[Turner *et al.* v. City of Mobile.]

them all, to-wit: the said several acts of the legislature
of Alabama, and the said ordinances of the said city of
Mobile, and the action of the said city of Mobile and of
the said Mobile river commission in respect of establish-
ing a channel line under said acts and ordinances afore-
said. And your oratrices further charge that this unjust
and inequitable claim and pretension of the said city of
Mobile that it owns absolutely and unconditionally the
title to the shore and the soil of Mobile river and of all
the wharves and other structures built out from the line
of ordinary high tide water mark to the channel line of
said river, within the corporate limits of the city of Mo-
bile as defined by the charter of 1866, and by its said
suits of ejectment to obtain the possession thereof has
caused, and is still causing, great anxiety and uneasi-
ness to the many persons owning the upland abutting
on the said waters of Mobile river who have built, and
who intended to go on building wharves, docks, bulk-
heads, booms, and other structures of like kind, out to
the channel of said river as designated, marked out, and
established as aforesaid, and has greatly depreciated,
and will continue to depreciate, the value of their said
property, and will deter the further improvement of the
said river fronts until the said unjust claim and preten-
sions of said city of Mobile is forever quelled, and your
oratrices and all others in like situation are quieted in
their right and title to the premises. That by reason of
their having no express grant from the State conferring
upon them, the legal title to the property in suit, they
are advised that they and all others in like situation
with them have not a full, complete and adequate rem-
edy at law, and that a court of equity only can give to
them that full, complete and perfect protection to which
they are entitled; besides, in order to avoid this mul-
tiplicity of suits which depend upon precisely the same
questions of law and upon the same facts, a court of
equity ought to entertain jurisdiction and by one single
action determine these issues between the said city of Mo-
bile and all the said defendants to said actions of eject-
ment, and all others owning or claiming to own said
wharves, bulk-heads, and other structures, and settle
and determine the rights of all the parties in respect

to the shore and the soil of Mobile river out to the channel lines of said river. [There is then set out in the bill the prayer for process.]

"Prayer for relief.—And may it please your Honor to grant unto your oratrices a temporary injunction, *pendente lite,* restraining said city of Mobile from prosecuting its said action of ejectment aforesaid, until the hearing of this cause. And that upon the hearing of this cause your Honor will be pleased to perpetuate such injunction, and decree that the said city of Mobile and all persons claiming under it, be perpetually enjoined and restrained from prosecuting said ejectment suit aforesaid, and from molesting or disturbing your oratrices in the possession of said property out to the said channel line of Mobile river as established, and from asserting title or claim thereto, under the aforesaid act of the legislature of Alabama, approved January 31st, 1867, and the act of February 18th, 1895, as amended by the act of December 5th, 1896. And further that your Honor may be pleased to quiet the right, title and possession of your oratrices to their said wharf, bulk-head and improvements from oratrices' upland out to the said channel line of Mobile river aforesaid. And may it please your Honor to grant unto your oratrices such other, further, or different relief to which they may, in equity, be entitled in the premises, and as in duty bound, etc."

The defendant moved the court to dismiss the bill for the want of equity, and also demurred to it upon the following grounds: "1st. Because it appears from the original bill of complaint that the complainants have an adequate remedy at law. 2d. Because the complainants do not offer to do equity by accounting to the defendant for the rent of the property therein described during the time that they have held possession of the same. 3d. Because the original bill of complaint shows no offer by the complainants to surrender the possession of said property upon being paid for the improvements which are alleged to have been put upon said property by the complainants. 4th. Because the court judicially

knows that the present defendant is the successor of the city of Mobile as it existed on the thirty-fist day of January, 1867, and is entitled to the possession of the property which was granted to said defendant by the act of January 31, 1867. 5th. Because the original bill of complaint shows (a) that the property described in the complaint was vested in the city of Mobile by virtue of the act of January 31, 1867, and by virtue of the succession of the city of Mobile to the property rights of the old city of Mobile, and (b) that if this had not been the case, the title to the property sued for would, nevertheless, have been vested in the present defendant by virtue of the act of February 18, 1895, and the amendment thereto approved December 5, 1896. 6th. Because it appears from the original bill of complaint that the said police board of the port of Mobile had no power or authority to convey away defendant's title to the property described in the original bill of complaint, or to grant any irrevocable license thereupon. 7th. Because it appears from the original bill of complaint that the Mobile river commission had no power or authority to grant away defendant's title to the property described in the original bill of complaint, or to grant any irrevocable license thereon. 8th. Because it does not appear therein from the original bill of complaint that the improvements mentioned therein were erected under any authority duly obtained either from the city engineer or from the Mobile river commission. 9th. Because it does not appear from the original bill of complaint that the improvements mentioned in the original bill of complaint were erected in compliance with either the ordinance or the statute therein pleaded. 10th. Because the original bill of complaint alleges no facts constituting an estoppel against this defendant. 11th. Because the original bill of complaint does not show that complainants had any right whatever to make the improvements or erect wharves therein described. 12th. Because it does not appear from the original bill of complaint that the improvements therein described are erected upon the property for which this defendant has brought said suits in ejectment. 13th. Because it does not appear from the original bill of complaint upon what por-

tions of the property described in the original bill of complaint said improvements are erected. 14th. Because it does not appear from the original bill of complaint that the city of Mobile was guilty of any act or omission constituting an estoppel against it, or i the improvements were erected without notice of the defendant's title. 15th. Because the original bill of complaint does not show that the complainants are the owners of the riparian rights incident to the title to that portion of the shore and bed of Mobile river for which said ejectment suits were brought. 16th. Because it does not appear from the original bill of complaint when said improvements were made. 17th. Because it does not appear from the original bill of complaint that the city of Mobile was the owner of the property in question at the time that the improvements were made. 18th. Because it does not appear from the original bill of complaint that the complainants were exercising the license which they claim, at the time that the ejectment suits were instituted. 19th. Because the original bill of complaint seeks to deprive the defendant of its constitutional right of trial by jury. 20th. Because this court has no jurisdiction whatever to decide the question of titles to the lands in question. 21st. Because the original bill of complaint shows that the defendant has a perfect title to the lands in question. 22d. Because the original bill of complaint does not show that the said the Mobile river commission ever possessed or attempted to exercise any power to grant to the complainants either title or license upon said property. 23d. Because the original bill of complaint does not allege that said improvements were built in accordance with the established channel line. 24th. Because the original bill of complaint does not show when or under what circumstances the improvements were erected. 25th. Because the original bill of complaint does not show that the complainants are the lawful owners of the property which is bounded by the Mobile river at the point in question. 26th. Because the original bill of complaint does not show that the party who erected said improvements had the title to the land abutting on

high water mark at the time the improvements were erected. 27th. Because the original bill of complaint does not show that the complainants hold the property sued for in said ejectment cases under any grant from the United States government made prior to the admission of the State of Alabama into the Union, or from any Spanish grant, or from any grant or license from the State of Alabama or the city of Mobile. 28th. Because the original bill of complaint does not show that the complainants are now or were ever riparian owners. 29th. Because it does not appear from the original bill of complaint what is the present value of the improvements alleged to be upon said property, or that its present value exceeds the rent and damages for which the complainants are liable to the defendant."

The defendant also demurred to the said bill of complaint in so far as it is filed on behalf of persons other than the complainants, upon the ground that "it does not appear from the original bill of complaint that the complainants have any right, title or interest in or to any lands which are the subject-matter of the litigation in the other ejectment suits therein referred to, or that the defendants in said other ejectment suits have any right, title or interest in said lands for which the complainants are sued, or in the lands for which they themselves are sued."

Upon the submission of the cause on the motions to dismiss and upon the demurrer, the chancellor rendered a decree sustaining the motions to dismiss the bill for the want of equity and the demurrers; including in his decree that said bill should "stand dismissed out of this court unless amended before the second day of the next term of this court, so as to give it equity." From this decree the complainants appeal, and assign the rendition thereof as error.

L. H. & E. W. FAITH, for appellants.—"Where a number of persons have separate and individual claims and rights of action against the same party, but all arise from same common cause, are governed by the same legal rule, and involve similar facts, and the whole matter might be settled in a single suit brought by all these per-

sons uniting as co-complainants, or one of the persons suing on behalf of the others, or even by one person suing for himself alone," a bill in equity will be allowed in order to avoid a multiciplicity of suits."—1 Pom. Eq. Juris., §§ 245, 255, 257, 268, 269, 273; *Osborne v. Wis. Cen. R. R. Co.*, 43 Fed. Rep. 824.

While the plaintiff's have separate and distinct interests, because of their respective claims of ownership of separate and distinct tracts of land, they have a community of interest in the subject-matter of the controversy, relating to these lands, and a common source of title, namely, the action of the State creating a harbor and river commission, and the establishing of a harbor or channel line and the granting permission to the owner of the upland to wharf out to such channel line; they have thus a community of interest in the questions of law and fact upon which the issue between the city of Mobile and each plaintiff depends. The city's claim is good or bad against all the plaintiffs, as it may be good or bad against any of them. The case is peculiarly one in which the jurisdiction of a court of equity may be invoked in order to avoid a multiciplicity of suits.—*Osborne v. Wis. Cen. R. R. Co.*, 43 Fed. Rep. 824; *Pennefeather v. Baltimore*, 58 Fed. Rep. 484; *Prentice v. Duluth Co.*, 58 Fed. Rep. 441; *Crews vs. Burcham*, 1 Black, 352; *Western Land Co. vs. Guinauct*, 37 Fed. Rep. 523; *Murray v. Hay*, 1 Barb. Ch. 59; *DeForest v. Thompson*, 40 Fed. Rep. 377; *Whitney Nat. Bank v. Parker*, 41 Fed. Rep. 402.

We, therefore, respectfully submit that the demurrer and motion should have been overruled, and that this court should so decree.

What are the rights of a riparian owner? The right of the owner of the upland of access to the navigable water in front of his land. The second riparian right is the right to accretions, alluvion, and reliction. The third right is the right to wharf out to the navigable water. Gould on Waters, §§ 149, 168, 181; *Stanton v. Wheeler*, 21 Sup. Ct. Rep. 48; *Illinois v. Ill. Cen. R. R. Co.*, 146 U. S. 445; *Abbott v. Kennedy*, 5 Ala. 396; *Gould v. Hudson River R. R. Co.*, 6 N. Y. 522; *Yates v. Milwau-*

[Turner *et al.* v. City of Mobile.]

*kee,* 10 Wall, 497; *Steers v. Brooklyn,* 101 N. Y. 51; *Demopolis v. Webb,* 87 Ala. 669; *Murphy v. Montgomery,* 11 Ala. 586; *Leverich v. Mobile,* 110 Fed. Rep. 170 ;*Sullivan Timber Co. v. Mobile,* 110 Fed. Rep. 186.

The State holding in trust the title to the shore and bed of the river had the right to vest in the port of Mobile authority to establish a harbor line and require all owners of the upland fronting on the river to build their booms and wharves out to that line. This line was established and the wharf of complainants was built out according to the requirements of the river commission at great cost and expense. Were it conceded that before the acts and ordinances were enacted all these entries and structures on the "shore and bed of the river" were trespasses upon the property of the State, still, by acts of the legislature that which, theretofore, would have been an unlawful encroachment upon the land of the State was thereby made a lawful structure vesting a right of property thereto in the person maintaining it. It might also be conceded that the owners of the upland had no right to fill up the public waters in front of their lands, and that they could acquire no title to the firm land made by such filling before the act authorizing the establishment of a harbor line. But, did not these acts, and the ordinance in pursuance thereof, bestow upon the owners of the upland new rights of property? Were they not thereby authorized to extend their lots into the water as far out as the channel line? If so, then when the extension was made, did it not become a statutory addition to the original lot, and is it not held by the same title? In fact, was not the original lot made larger? Its legal identity was not changed by an increase of its dimensions. The addition so made to the firm land was, we submit, an accretion lawfully made under legislative authority, and thereby became part of the upland.—*Port of Deposit v. Crothers,* 40 Atl. Rep. 265, 266; *Horner v. Pleasants,* 66 Md. 475; *Casey v. Inloes,* 1 Gill. (Md.) 501; *Abom v. Smith,* 12 R. I. 373; *Gerhard v. Com.,* 15 R. I. 334; *Engs. v. Peckham,* 11 R. I. 223; *Fitchburg v. Boston,* 3 Cush. 71; *Hamlin v. Manufacturing Co.,* 141

7c

Mass. 51-57; s. c. 6 N. E. Rep. 531; *Haskell v. New Bedford*, 108 Mass. 209-216; *Stears v. Brooklyn*, 101 N. Y. 51.

The action of the legislature in establishing a harbor line is to be construed as a regulation of the exercise of the riparian right; it settles the line of navigability, above which the State will not interfere; and is an implied concession of the right to build, possess and occupy to the established line, which amounts practically to a qualified possessory title.—*Miller v. Mendenhall*, 44 N. W. Rep. 1143; s. c. 19 Am. St. Rep. 219; s. c. 8 L. R. Anno. 89; *Bradshaw v. Duluth*, 53 N. W. Rep. 1066.

The riparian proprietor is entitled, among other rights, as held in *Yates v. Milwaukee*, 10 Wall. 497-504, to access to the navigable part of the water on the front of which lies his land, and for that purpose to make a landing, wharf, or pier for his own use, or for the use of the public, subject to such general rules and regulations as the legislature may prescribe for the protection of the rights of the public. In the cases cited, the court held that this riparian right was property and valuable;and though it must be enjoyed in due subjection to the rights of the public, it could not be arbitrarily or capriciously impaired.—*Illinois Central R. R. Co. v. Illinois*, 146 U. S. 445-453; *Yates v. Milwaukee*, 10 Wall. 497; *Dutton v. Strong*, 1 Black. 23-33; *Schurmeier v. R. R. Co.*, 7 Wall. 272-290; *Chicago & B. R. R. v. Chicago*, 166 U. S. 226-241; Gould on Waters, § 149; *Ockerhauser v. Tyson*, 40 Atl. Rep. 1041; *Pryor v. Schwartz*, 25 Atl. Rep. 398.

The complainants, as owners of the upland fronting on the Mobile river, possess, not only as an incident of such ownership, the riparian right to build out to navigable waters, which is a valuable property right protected by the 14th amendment to the Federal constitution, but they also have this right as a statutory right, franchise, or privilege from the state to so build out, which being based upon a consideration and accepted is a contract right protected by section 10 of article one of the same constitution.—*City R. R .Co. v. Citi-*

*zens R. R. Co.,* 166 U. S. 562; *People v. O'Brien,* 18 N. E. Rep. 697-698; s. c. 111 N. Y. 1; *Miller v. Mendenhall, supra; Hamlin v. Mfg. Co.,* 141 Mass. 57; *Norfolk v. Cooke,* 27 Grat. 438; *Guy v. Hermance,* 5 Cal. 74; *Power v. Tazewells,* 25 Grat. 786; Gould on Waters, §§ 138-140.

The city of Mobile being thereunto authorized by the act of 1882 to establish by ordinance channel lines, and to prescribe the extent and manner wharves and other structures should be built, and having by ordinance established the channel lines and prescribed the extent and the manner, and with what material, wharves, etc., might be constructed, and the wharf of appellants having been constructed and maintained under and in compliance with said acts of 1882, 1886 and 1887, and of said city ordinances, at great expense, and the payment of the dues prescribed by the act of 1887, it would seem that if justice, good faith, and good conscience is to be maintained in our jurisprudence, there arises up against the city of Mobile an estoppel against drawing in question the validity, legality, and lawfulness of the acts and ordinances under which the wharf of complainants and those under whom they claim, was constructed, and also estopped from asserting its legal title, to the prejudice of complainants' right to enjoy that which they have constructed under said acts and ordinances.—2 Story's Equity (13th ed.), § 154; *Goetter, Weil & Co. v. Norman,* 107 Ala. 596; *L. & N. R. R. Co. v. Ala. & G. S. R. R. Co.,* 102 Ala. 237.

Having not only consented to, but authorized, even directed the improvements to be made, it would seem that it ought not to be permissible to allow the city of Mobile to question the legality of that which has been done, under its authority and direction, to the prejudice of the complainants.—*Hoene v. Pollak,* 118 Ala. 622.

Municipal corporations are concluded by estoppel as much as individuals.—*Town of Brewton v. Spira,* 106 Ala. 235; *Hackett v. City of Ottawa,* 99 U. S. 86; *Sheffield v. Harris,* 101 Ala. 569; *City R. R. Co. v. Citizens R. R. Co.,* 166 U. S. 566.

GREGORY L. & H. T. SMITH, *contra.*—It is true that the bill in this case alleges that the city of Mobile has brought suit against divers persons other than the complainants. These persons are not named or otherwise designated. The complainants have no interest, whatever, in these persons, or in the lands for which they are sued, nor is it alleged that these persons themselves have any interest in or title to the lands or any defense whatever to the actions of ejectment. A bill, however, we think, must stand or fall without reference to suits against parties other than the complainants. In the first place, these persons are not made parties, and may never become such, and it is only a multiciplicity of suits to which the complainants are liable to be subjected, which will induce the chancery court to interfere for their protection. It is not easy to understand how a complainant can be subjected to vexation, or can have the right to complain, by reason of any litigation to which it is not a party or liable to become such.—*O'Brien v. Fitzgerald,* 39 N. Y. 707; *Dodd v. City of Hartford,* 25 Conn. 232; *Swift v. Carrabelle,* 31 Conn. 225; *Wilkerson v. Walters,* 1 Idaho 564; 3 Rand. 394; *Scottish Union, etc.,v. Mohlman,* 73 Fed. Rep. 66; *Schulenberg L. Co. v. Hayward,* 20 Fed. Rep. 422; *Thomas v. Council B. C. Co.,* 92 Fed. Rep. 422; *Youngblood v. Sexton,* 32 Mich. 406; *Barnes v. City of Beloit,* 19 Wis. 93; *Cutting v. Gilbert,* 5 Blatch, 259; s. c. Fed. Cases, 3519.

There is no community of interest whatever between the complainants and the defendants in the other ejectment suits. The only interest in common between them which is indicated in the bill, is an interest in an abstract proposition of law, and not a common interest in the property involved, and a common interest in a legal proposition will not authorize the joinder of parties. *Scott v. Donald,* 165 U. S. 115; *Cutting v. Gilbert,* Fed. Cases 3519. The complainants insists that their theory is supported by 1 Pomeroy's Equity Jurisprudence, page 255, in the case of *Osborne v. Railroad Co.,* 43 Fed Rep. 824. An examination of the authorities upon which the decision and text books are made to rest, will demonstrate that they do not support the

proposition of law as therein stated. For a full review of these authorities see *Tribette v. Cen. R. R. Co.*, 12 So. Rep. 32.

Indeed, it is always necessary to the right of the complainant to an injunction, in order to avoid a multiplicity of suits, that he should first establish his right at law.—Story Eq. Jur., § 859; *Woodward v. Seely*, 50 Am. Dec., 445; *Pa. C. Co. v. Delaware and H. C. C.*, 31 N. Y. 91; *Patterson & R. H. R. R. v. J. C.*, 9 N. J. Eq. 434; *Lacassaque v. Chapins*, 144 U. S. 124. In order to maintain a bill for the purpose of enjoining a multiciplicity of suits, it is always necessary that the bill should show that the complainants have a defense to the actions at law. The fact that the complainants' title is equitable may constitute an independent equity; but there is never an equity to prevent a multiciplicity of suits to which the complainants have no just defense. To establish such an equity would be to enable the wrongdoer to destroy all legal remedy for his wrong.—*Venice v. Woodruff*, 62, N. Y. 462; *Storrs v. Railroad*, 11 So. Rep. 266; *Tribette v. Ill. Cen. R. R.*, 12 So. Rep. 32. That the bill cannot be maintained for the purpose of preventing a multiciplicity of suits, without alleging the existence of probability of more than one or two suits in which the complainant has an interest, must be regarded as settled.—Story Eq. Jur., § 857; *Attalla Mining & Milling Co. v. Winchester*, 102 Ala. 192; *Nevitt v. Gillespie*, 26 Am. Dec. 696; *Eldridge v. Hill*, 2 John's Ch. 281; *Gunn v. Harrison*, 7 Ala. 587; *Moses v. Mayor of Mobile*, 52 Ala. 209.

We conclude, therefore, that there is no equity in the bill on account of a multiplicity of suits;

1st—Because there is only one suit in which complainants are interested.

2d—Because the suits sought to be enjoined involve a legal title to the land in question, and the complainants have not established their right at law.

3d—Because the bill shows upon its face that the complainants have no defense to the action at law.

4th—Because the defendants in the other ejectment suits are not alleged to have any title to the lands for which they are sued.

[Turner *et al.* v. City of Mobile.]

5th—Because there is no community of interest between the different defendants in the several ejectment suits, their titles not being derived from the same source.

6th—Because, in order to justify an injunction to prevent a multiplicity of suits, the community of interest of the parties must be in the subject matter of the litigation, and not in the abstract proposition of law involved. See authorities *supra*.

The bill in this case does not allege that any of the defendants in the· ejectment suits, other than the complainants themselves, possess any title whatever to the land for which they are sued. As to the tract of land for which complainants are sued, the complainants' title is alleged to depend upon a grant of land bounded by the Mobile river, which is a navigable stream where. the tide ebbs and flows. The complainants assert that they obtained their right to the possession of the land sued for as incidental to their legal title to the upland, which title to the upland has never been settled at law, and is now disputed. If we concede all that the complainants contend for in regard to the matter of riparian rights depending upon the legal title to the upland, a court of equity could not decide the controverted question of title to the upland, and, therefore, could not pass upon the existence of riparian rights depending thereon. *A. J. Hamilton v. Brent Lumber Co.*, 127 Ala. 78; *Ashhurst v. McKenzie*, 92 Ala. 490; *Keller v. Burlington*, 101 Ala. 267; *Lacassaque v. Chapins*, 144 U. S. 124; *Allen v. Asslidar*, 28 Fed. Rep. 261.

The land of ·the upland owner being thus separated from the water no longer carries with it riparian priviliges of any kind.—1 Am. & Eng. Ency. Law, 469, note 2 and citations; *Bates v. Cen. Ry. Co.*, 1 Black. 204; *Soulet v. Shepard*, 4 Wall. 502; *Heirs of Leonard v. City of Baton Rouge*, 4 So. Rep. 241; *State v. Buck*, 15 So. Rep. 531. Indeed, it is always the owner of the shore, and not the owner of the lands abutting ,on the shore, that possesses the riparian rights, where the title to the shore has been severed from that of the upland.— Angel on Tide Water, 254; *New Orleans v. United*

*States*, 10 Pet. 662; Gould on Waters, 156; *Swetinger v. St. Louis*, 52 S. W. Rep. 349; *Soulet v. Shepard*, 4 Wall, 502; 1 Am. & Eng. Ency. Law, (2d ed.) 469; *Sage v. New York*, 47 N. E. Rep. 1096; *Briggs v. Pfeil*, 25 P. L. J. 18.

They follow the shore, and not the land above the shore, and where the city owns the bank of the river, it is the riparian owner.—Gould on Waters, 156 and citations; *New Orleans v. United States*, 10 Pet. 716.

The right to accretions and of wharfing is legal, and not equitable, in its nature.—*City of Mobile v. Eslava*, 9 Porter 577; *Ellinger v. Mo. Pac. Ry. Co.*, 20 S. W. Rep. 800; *Pollard v. Files*, 2 How. 607; *Fulton v. Frendolig*, 63 Tex. 339; *James v. Howell*, 41 Ohio State 693; *Cook v. McClure*, 58 N. Y. 437; *Overingen v. St. L.*, 52 S. W. Rep. 348; *Dunlap v. Stetson*, Fed. Cas. 4164; 1 Am. & Eng. Ency. Law (2d ed.), 472, note; *Hoboken v. Penn. R. R. Co.*, 124 U. S. 690.

Riparian rights must be derived from some one who owns them; they do not descend from the clouds upon the owner of an adjoining shore, but pass from the grantor whenever and only where the grantor owns them, and evidences his intention to convey them. Where the United States government or the State, or any other person, owns both the adjoining land and the riparian rights, they or it may convey the first to one person and the second to another, and thereafter the two become separate properties, and neither passes as an incident to the other.—*City of Mobile v. Eslava*, 9 Port. 578; s. c. 16 Pet. 251; *Hoboken v. Penn. R. R. Co.*, 124 U. S. 690; *Hagan v. Campbell*, 8 Port. 12; *Shivley v. Bowlby*, 152 U. S. 28 and 35; *Goodtitle v. Kibbe*, 9 How. 474; *Howard v. Ingersoll*, 17 Ala. 792; *State v. City of New Jersey*, 25 N. J. L. 525; *Stevens v. Patterson & N. R. R.*, 34 N. J. L. 546; *Hardin v. Jordan*, 140 U. S. 381; *Blanchwood v. Porter*, 11 Ohio 138; *Kaukauna W. P. Co. v. Green Bay Canal Co.*, 142 U. S. 254; *Musser v. Hershey*, 47 Iowa 361; *Simmons v. French*, 25 Conn. 346.

Indeed, the State may grant to any individual the right to so wharf out upon the shores in front of another's land without compensation to the latter. This

is no violation of the riparian owner's rights.—*Martin v. O'Brien*, 34 Miss. 22; *Ravenswood v. Fleming*, 22 W. Va. 52; *Eisenbach v. Hatfield*, 2 Wash. 23; *Harbor Line Comrs. v. State*, 2 Wash. 531. The right to wharf out rests upon passive or implied license merely. The State may regulate it, or even prohibit it.—*Cohn v. Wausaw Boom Co.*, 47 Wis. 302; *Diedrich v. R. R. Co.*, 42 Wis. 262; *Eisenbach v. Hatfield*, 2 Wash. 236; *Harbor Line Comrs. v. State*, 2 Wash. 531; *State v. Sargent*, 45 Conn. 358; *Musser v. Hershey*, 47 Iowa 361; *Stevens v. P. R. R. Co.*, 5 Vroom 532; *Stewart v. Fitch*, 2 Vroom 18; *Keyport, etc., v. Farmers' Trans. Co.*, 3 C. E. Green (N. J.) 511. The right to reclaim the shore is a mere franchise. *Lockwood v. N. Y., etc., R. R. Co.*, 37 Conn. 388.

The right of the owner of land bounded by navigable waters is revocable by the State, who may grant the right of accretions to a third person.—*State v. City of New Jersey*, 25 N. J. L. 525; *Penn. R. R. v. N. Y., etc., R. R.*, 25 N. J. Eq. 158; *Stevens v. Patterson & N. R. R.*, 34 N. J. L. 546; *Hardin v. Jordan*, 140 U. S. 381; *Hoboken v. Penn. R. R.*, 124 U. S. 565; *Shively v. Bowlby*, 152 U. S. 35.

The question as to whether an abutting owner shall be permitted any riparian rights, whatever, is a question of State policy, subject, at any time, to a modification, and where such rights are recognized, they arise from a mere license, which is revocable at any time before its existence.—*Shively v. Bowlby*, 152 U. S. 35; *Stevens v. Pat. & Newark R. R. Co.*, 34 N. J. L. 539; *Conn. L. v. N. Y. & H. R. R. R.*, 37 Conn. 388; *Musser v. Hershey*, 47 Iowa 361.

Even if the bill of complaint contained such allegations as would have estopped a private owner of the property from disputing the rights of the complainants it would, by no means, follow that the city would be estopped from asserting its title to public property.—*Mobile v L. & N. R. R. Co.*, 124 Ala. 132; *Meriweather v. Barrett*, 102 U. S. 511; Herman on Estoppel, 1365-6, § 1222; *Jersey City v. Am. Dock & Imp. Co.*, 23 Atl. Rep. 682.

Indeed, it is said in *Webb v. Demopolis*, 95 Ala. 135, that it is doubtful whether a municipal corporation can

ever be estopped by any act, whatever, as to its public property, and we think it is now well settled that it cannot.—*Jackson County v. Derrick,* 117 Ala. 365; *Jersey City v. Am. Dock & Imp. Co.,* 23 Atl. Rep. 682; *State v. Brewer,* 64 Ala. 287; *United States v. Kirkpatrick,* 9 Wheaton 720; *Galveston H. & S. R. R. Co. v. State,* 36 S. W. Rep. 115-6; *Day Land & Cattle Co. v. State,* 4 S. W. Rep. 878; *Reed v. Birmingham,* 92 Ala. 339; *Jersey City v. Canal Co.,* 1 Beasley (N. J.) 547; *Cross v. Mayor,* 18 N. J. Eq. 312; *Com. v. McDonald,* 16 George & R. 399; 13 Ill. 60; *Alleghany Co. v. Parrish* (Va.), 25 S E. Rep. 882; *Rund v. Fowler,* 41 N. E. Rep. 456; *Freeport St. Ry. Co. v. City of Freeport,* 38 N. E. Rep. 137; *New York v. N. Y. Gen. & H. Co.,* 23 N. Y. 562; *Wilkinson v. Meridian,* 69 Miss. 288; *Mary Lee Coal Co. v. Wann,* 97 Ala. 495; *Ill. C. Ry. Co. v. Illinois,* 146 U. S. 387; *Brown v. Morris C. & B. C.,* 27 N. J. L. 650.

But the bill of complaint in this cause would not show an estoppel even against a private individual. In the first place, it shows no act of misrepresentation, which would itself be a fatal omission. Indeed, the bill alleges tacit failure of the city to sue for its property for some years, but this is all.—*Porter v. Wheeler,* 105 Ala. 457; *Colbert v. Danne,* 32 Ala. 314; *Wall v. Grisly,* 42 Ala. 473; 19 Century Digest, § 274, Col. 2378.

But even if an estoppel existed, as is supposed by the complainant, it would be a grave misapprehension to suppose that because the owner of land has induced the erection of improvements upon his land by a third person, or the expenditure of money in any other way, under the belief that his title was perfect, there would be an estoppel against suing for the land itself. That the limit of the estoppel is that the owner will not oust the person making the improvements without compensating him therefor, is clear.—*Cowan v. So. Ry. Co.,* 118 Ala. 561; *St. Louis v. Green,* 13 Fed. Rep. 213; *Lindsey v. Cooper,* 94 Ala. 184; *Dickerson v. Colgrave,* 100 U. S. 380; *Steel v. Smelting Co.,* 106 U. S. 456; *Green v. Biddle,* 8 Wheaton 1; *Leighton v. Young,* 52 Fed. Rep. 442; *Canal Bank v. Hudson,* 111 U. S. 82 and 83.

A parol license to do an act on the land of the licensor while it justifies anything done by the licensee before

the revocation, is revocable at the option of the licensor, and, although the intention was to confer a continuous right, and money had been expended by the licensee upon the faith of the license, such license can not be changed into an equitable right on the ground of an equitable estoppel. There has been much contrariety of decision in the courts of various State, and jurisdiction. But the best authorities have upheld with great steadiness the general rule that a parol license to do an act on the lands of the licensor, while it justifies anything done by the licensee before revocation, is, nevertheless, revocable at the option of the licensor, and this, although the intention was to confer a continuing right, and money had been expended by the licensee upon the faith of the license.—*Cronkite v. Cronkite*, 94 N. Y. 323; *Pitzman v. Boyce*, 111 Mo. 387. "To say that the license is irrevocable because the thing permitted to be done necessarily involved an expenditure of money, would be going beyond the most extreme views of the subject, and make most licenses irrevocable. The practical effect of such a doctrine would be to make most licenses conveyances of an interest in land by mere estoppel *in pais.*—*Pitzman v. Boyce*, 111 Mo. 387; *Jamieson v. Millerman*, 3 Duer 255; *Lawrence v. Springer*, 49 N. J. Eq. 289; s. c. 31 Am. St. Rep. 711; 7 Wait's Actions and Defenses, 206, and citations; *Minneapolis Mills Co. v. Minn. St. L. R. R. Co.*, 51 Minn. 304; 53 N. W. 689; *Minn. W. Ry. Co. v. Minn. St. L. Ry. Co.*, 58 Minn. 129; 59 N. W. 983; *Hodgins et al. v. Farrington*, 150 Mass. 19; s. c. 22 N. E. 73; *Fabian v. Collins*, 3 Mont. 215; *Hathway v. Y. W. L. & P. Co.*, 15 Wash. 469; *Johnson v. Skillman*, 29 Minn. 95; s. c. 43 Am. Rep. 192; 12 N. W. 149; *Cronkite v. Cronkite*, 94 N. Y. 323; *Beck v. L. N. O. & T.*, 65 Miss. 172; *Tanner v. Voluntine*, 75 Ill. 625; *Collins Co. v. Marcy*, 25 Conn. 239; *Wood v. Mich. R. R.*, 80 Mich. 334; *Bobcock v. Utter*, 32 Haw. B. 439; *Davis v. Townsend*, 14 Barb. (N. Y.) 333; *Peoples v. Godwin*, 5 N. Y. 568; *Whitaker v. Cawthorn*, 3 Dey (6 N. C. L. 389; *Greely v. Stillson*, 27 Mich. 153; *March v. Bellew*, 45 Wis. 36; *Sovereign v. Ortman*, 47 Mich. 181; *Spalding*

*v. Archibald,* 52 Mich. 365; *R. & D. R. R. v. D. & N. R. R..* 104 N. C. 658; *Benedict v. Benedict,* 5 Dey (Conn.) 468; *Houghtaling v. Houghtaling,* 5 Barb. 383; *Cook v. Stearns,* 11 Mass. 533; *Stevens v. Stevens,* 11 Met. (Mass.) 251; *Miller v. Auburn & S. R. R. Co.,* 6 Hill (N. Y.) 61; *Hayo v. Richardson,* 1 Gill & J. (Md.) 366; *Wright v. Freeman,* 5 Harr. & J. (Md.) 467; *Clute v. Carr,* 2 Wis. 531; *Fryer v. Warne,* 29 Wis. 511; *Moulton v. Fought,* 41 Me. 297; *Pitman v. Poor,* 38 Me. 237; *Houston v. Saffer,* 46 N. H. 505; *Dodge v. McClenstock,* 47 N. H. 383; *Wingard v. Tuft,* 24 Ga. 179; *Land v. Miller,* 27 Ind. 534; *Cook v. Pridgen,* 45 Ga. 331; *Williamston & T. R. R. v. Battle,* 66 N. C. 540; *Cumberland Valley R. R. v. McLanahan,* 59 Pa. St. 23; *Tufts v. Copen,* 37 W. Va. 623; *Hetfield v. G. R. Co.,* 29 N. J. Law, 571.

McCLELLAN, C. J.—Mamie L. Turner and Emma B. Morris are the complainants in this bill filed against the City of Mobile, in behalf of the complainants "as well as on behalf of all others similarly situated," etc., etc. The bill will be set out in the report of the case in full excepting and omitting the prayer for process, the foot note and the verification. The respondent entered a motion to dismiss the bill for want of equity and also demurred to it on a number of grounds challenging its sufficiency in every respect. Both the motion and the demurrer were sustained by the chancellor, and the complainants appeal.

It was intended by certain averments of the bill to present a case for the interposition of the chancery court to the prevention of a multicilicity of suits, and it is contended here that apart from all other considerations the bill has equity to that end. It appears by the bill that the respondent, the City of Mobile, has instituted thirty or more actions of ejectment, and among them one against the complainants, for the recovery from each separately of distinct lots or parts of the shore of Mobile river within the corporate limits of the city of Mobile, that the claim of title on the part of the city of Mobile is the same in each of the several suits, and that the attitudes and rights of the defendant in each of these

actions are the same as or similar to the rights of these complainants in the statutory real action brought by the city against them for the recovery of a certain lot, being a part of said shore. Upon these facts, with a further averment of a general state of anxiety and perturbation on the part of all these defendants in the divers actions at law, the bill, as we have seen, is exhibited by Mistresses Turner and Morris "in their own behalf as well as on behalf of all others similarly situated  *  *  *  in respect of the subject-matter of the controversy relating to the lands lying below ordinary high tide water mark of the Mobile river" in the city of Mobile. But these other defendants at law are not made parties to this bill, nor is any relief prayed in their behalf, the prayer for relief being specially that the action of ejectment against these complainants be perpetually enjoined, and · generally for such other, further and different relief as *these complainants* may be entitled to in equity.

However uncertain and nebulous may be the scope and limitations of the jurisdiction of chancery to prevent multiciplicity of suits upon adjudged cases and texts in other respects, upon one proposition the authorities are agreed, and this proposition is certain and established. It is this: That the party or parties who invoke this jurisdiction must have some prior legal or equitable right in the premises. It cannot be invoked at all for the mere prevention of a multiciplicity of suits by bringing into one litigation numerous pending or imminent actions by a party who is without cause of action or ground of defense. The proposition is stated and emphasized by Mr. Pomeroy thus: "In the first place, and as a fundamental proposition, it is plain that prevention of a multiplicity of suits is not, considered by itself alone, an independent source or occasion. of jurisdiction in such sense that it can create a cause of action where none at all otherwise existed. In other words, a court of equity cannot exercise its jurisdiction for the prevention of a multiplicity of suits in cases where the plaintiff invoking such jurisdiction has not any prior cause of action, either equitable or legal; has not any prior existing right

to *some* relief, either equitable or legal. The very object of preventing a multiciplicity of suits assumes that there are relations between the parties out of which other litigation of *some* form might arise."—1 Pom. Eq. Jur., § 250. If a party—to give an illustration—be brought to the bar of a law court in forty separate actions of ejectment for as many distinct parcels of land, by the same plaintiff upon identical facts in each case, he could not invoke the jurisdiction of equity to a prevention of a multiplicity of suits if he were a mere naked trespasser and wrongdoer in respect to the land severally sued for, had no title legal or equitable, no right to the possession, no defense to any of the actions: He cannot invoke equity merely to have his wrongdoing adjudged in one suit instead of forty. The statute would give him relief in such circumstances (Code, § 3318) and for that reason, too, he could not come into chancery; but with or without the statute, he woud have no standing in equity. So here—assuming for the moment that the case otherwise would be one of equitable cognizance under the head of equity jurisprudence being considered—if this bill showed no right in the complainants, no title legal or equitable to the land, and no defense to the actions of ejectment, it could not be maintained merely to the end of having the unquestioned right of the plaintiff in each of the thirty or more real actions declared by one decree in the court of chancery and thereby preventing its declaration in each of the actions at law.

If the bill shows an equitable title in the complainants, a title which in equity and good conscience should prevail against the dry legal title of the plaintiff, but which could not be asserted by law, it would have equity on that ground alone, and it would be immaterial and unimportant whether its invocation of equity jurisdiction for the prevention of a multiplicity of suits were rested on a proper state of facts or not. So that the only inquiry of practical importance on this part of the case is whether, assuming that the bill shows a *legal title* or defense in the complainants and in each of the defendants in the several other actions of ejectment, the complainants can, under the doctrine of prevention of a mul-

[Turner *et al.* v. City of Mobile.]

tiplicity of suits, maintain a bill for the purpose of drawing into one litigation all these separate and distinct actions of ejectment with none of which except that one which is pending against them have they the least concern, and this, too, without making any of such other ejectment defendant parties complainant or defendant to the bill, and also without praying any relief for such other defendants. The question in another form is this: Can A, upon being sued in ejectment for a parcel of land to which he claims to have the legal title, or which he claims the legal right to hold against the plaintiff, maintain a bill to enjoin the action at law and have his legal title or defense adjudged and his possession conserved thereunder solely upon the ground that B, C, D, E and F are also being sued by the same plaintiff for other and distinct parcels of land which the plaintiff claims under the same chain of title that he relies on against A? The adjudged cases and law texts are quite inharmonious and conflicting as to the extent of and limitations upon the jurisdiction of the chancery court to entertain and grant relief upon bills for the prevention of a multiplicity of suits. This will appear from the discussion of the subject by Mr. Pomeroy. (1 Eq. Jur., §§ 243-275.) The point of chief divergence in cases of bills filed by or in behalf of or against numerous parties, is in respect of the necessity *vel non* of privity among such parties or community of interest on their part *in the subject matter* of each of the suits to be prevented. That author takes the position that such privity or community of interest is not essential to be alleged and proved in such cases, but that it will suffice if there be a community of interest in *the question* involved in all the cases. He divides the cases of *possible* jurisdiction for the prevention of a multiplicity of suits into four clases. There is no pretense that this case falls within the first, second or fourth classes. The third he defines thus: "3. When a number of persons have separate and individual claims and rights of action against the same party, A, but all arise from some common cause, are governed by the same legal rule, and involve similar facts, and the whole matter might be settled in a single

suit brought by all these persons uniting as co-plaintiffs, or one of the persons suing on behalf of the others, or even by one person suing for himself alone. The case of several owners of distinct parcels of land upon which the same illegal assessment or tax has been laid, is an example of this class."—1 Eq. Jur., § 245. In subsequent sections the author undertakes to "enumerate the various kinds of cases in which the jurisdiction to prevent a multiplicity of suits has been exercised, and over which it has been settled by a preponderance of judicial authority," and of the third class he has this to say: "The cases constituting this class must be divided into several different groups, all depending, however, u,.on the same principle. [1] The jurisdiction is exercised in suits brought by numerous persons to establish their separate claims against a single party, where these claims, although separate, all arise from a common title, and there is a common right, or a common interest in the subject matter; [2] in suits by numerous individual proprietors of separate tracts of land to restrain and abate a private nuisance or continuous trespass which injuriously affects each proprietor; [3] in suits by numerous judgment creditors to reach the property and enforce their judgments against the same fraudulent debtor; [4] in suits by numerous owners to set aside or restrain the collection of an illegal assessment for local improvements laid by a town, city, county, or other municipal corporation, and made a lien on their respective lots; [5] and in suits by numerous taxpayers of a town, city, county, or other district to restrain or set aside an illegal general tax, whether personal, or made a lien upon their respective property, or an illegal proceeding of local officials whereby a public debt would be created and taxation would be increased."—1 Eq. Jur., § 273. Now these thirty or more defendants in the actions of ejectment instituted against them severally and respectively by the city of Mobile do not claim a common title to the parcels of land for which each of them is sued. The bill makes no such pretense, but for aught that appears, and it may well be the fact, the claim of each one of them arises from a title entirely distinct and dissociated from every

other one. And it is equally clear that no one of them has any interest in the lots of land for which the other twenty-nine or more are sued. These lots severally, of course, are the subject-matters of the several suits; and there is no room to say from the averments of the bill that the party claiming any one of the lots has a common right or common interest in the subject-matter, the lot, involved in any of the other suits. So it is palpable that the bill in the aspect under consideration cannot be maintained under the first group of the section last above quoted. That it does not fall within *the terms* of either of the other clauses, requires no discussion to demonstrate. That it is not supported by the *principle* underlying the propositions of the other clauses seems also clear. The community idea, so to speak, in each of them lies in two facts which are absent in the case before us. In the first place the wrong done to the "numerous persons" of the text is one and the same wrong against them all, affecting each precisely alike. Here, assuming that the institution of an action of ejectment to which a defense is developed is a wrong, and that it is wrong to bring thirty or more such actions, there can be no pretense that the institution of thirty or more separate suits, against thirty or more separate parties for thirty or more distinct lots of land is one wrong, or that the institution of the one suit sought here to be enjoined was a wrong against and common to each and all the defendants in the twenty-nine or more other separate and distinct actions. In the next place in each of the cases put in the last four clauses of the section, a decree in favor of one or more of the parties against all whom the one wrong was committed and all whom it injures in the same way would *necessarily and directly* enure to the benefit of all said persons. Thus a decree at the suit of A cancelling a conveyance as a fraud an creditors, as effectually removes and destroys the conveyance as an impediment in the way of creditors B, C, and D as if they had been parties complainant with A in the bill. So if an illegal assessment levied upon the property of numerous persons is declared void, and vacated and annulled at the suit of one of them, all are equally re-

lieved thereby. And so also of illegal taxation, and of illegal official action the result of which is to increase taxation or the liabilities of taxpayers: If the illegal levy or unauthorized official imposition is expunged at the suit of one taxpayer, all equally share in the relief. Of course, in such cases all may join in a bill, or one may exhibit it on behalf of himself and the others or on his own behalf alone, for that in either case the result to them all is the same—relief to all of them from the consequences of the wrong that was done to all of them. But not so in the case here. To enjoin the city of Mobile to prosecute its action against A would not be to enjoin it to prosecute its other and distinct several actions against twenty-nine or more other persons who are not parties to this suit, and might never be even if the suit is allowed to continue, and in whose favor no relief whatever has been or could be prayed by A. The present bill is not, we conclude, within the terms or the principles underlying any of the statements made by Mr. Pomeroy in section 273 of the cases in which a bill may be maintained by one or more numerous persons similarly situated, etc., under the jurisdiction of equity for the prevention of a multiplicity of suits. Nor does this case fall within the general definition of class 3, quoted above from section 245. These thirty or more ejectment suits *cannot* be settled and determined upon a bill filed by the defendants in one of them on behalf of themselves and the others who are not made parties, or on behalf of themselves alone. A decree for these complainants would not bind either the plaintiff or the defendant in any of the other suits, it would not put an end to any one of them nor prevent the city of Mobile instituting any number of like suits, and having a separate trial in each: the decree, in short, would not prevent the multiplicity of suits alleged to be pending or imminent. Not only is this case not within the rule formulated by Mr. Pomeroy and not in any of the categories of cases stated by him, but no case cited by him in his elaborate and exhaustive consideration of this question on authority come to the point of authorizing such a bill under the doctrine of preventing

a multiplicity of suits. His argument, as we have indicated, goes further, but no case to which he referred sustains him beyond the formulated rules he has laid down. The editors of the second edition of his work cite as an illustration of the text the case of *Osborn v. Wisconsin Central Railroad Co.*, 43 Fed. Rep. 824. That decision was rendered *nisi prius*. The bill by several owners of distinct parcels of land to enjoin a multiplicity of actions of ejectment prosecuted against them by one and the same plaintiff was sustained. The case differs materially from this one, however, in that all the ejectment defendants in whose behalf relief was sought were actual complainants in the bill, and in this that the legal title of each of the complainants had in effect been adjudged and settled at law; and the case is not an authority for the maintenance of the present bill in reality filed by the defendants in one of the actions at law on their behalf alone for the prevention of a multiplicity of suits.

We have considered the position of Mr. Pomeroy on this question thus at length because the views of no text writer of the law are entitled to more consideration than his, because his work is the authority mainly relied upon by the appellants in this connection, and because we are disinclined to repudiate any proposition advanced by him without a thorough examination of it. The authorities which take a different view of the doctrine under discussion hold, as we have seen, that to authorize numerous persons to unite in one bill for the prevention of a multiplicity of suits, they must have a common title to or a common interest in the *subject-matter* involved, and that a mere common interest in a *question of law* involved in the pending or threatened suits will not suffice. This position is nowhere better or more fully stated than by CAMPBELL, C. J., in *Tribette v. Illinos Central Railroad Co.*, 70 Miss. 182, and as the opinion treats fully of Mr. Pomeroy's position, and demonstrates its fallacy, we quote it in part: "The question presented is as to the rightfulness of the suit against the defendants, on the sole ground that their several actions at law involve the very same matters of fact and law, without any other

community of interest between them. The granting and maintaining the injunction are fully sustained by Pomeroy's Equity Jurisprudence, vol. 1, § 255 *et seq.*, and it is probable that any judge authorized would have granted the injunction upon the text cited. But we affirm, after careful examination and full consideration, that Pomeroy is not sustained in his 'conclusions,' stated in § 269 of his most valuable treatise, and the cases he cited do not maintain the proposition that mere community of interest 'in the questions of law and fact involved in the general controversy, or in the kind and form of relief demanded and obtained by or against each individual member of the numerous body,' is ground for the interposition of chancery to settle, in one suit, the several controversies. There is no such doctrine in the books, and the zeal of the learned and unusually accurate writer mentioned, to maintain a theory, has betrayed him into error on this subject. It has so blinded him as to cause the confounding of distinct things in his view of this subject, to-wit: joinder of parties, and avoidance of *multiplicity of suits.* It has been found that many of the cases he pressed into service to support his assertion are on the subject of joinder, where confessedly there could be no doubt that the matter was of equity cognizance. Every case he cited to support his text will be found to be either where each party might have resorted to chancery or been proceeded against in that forum, or to rest on some recognized ground of equitable interference other than to avoid multiplicity of suits. The cases establish this proposition, viz.: Where each of several may proceed or be proceeded against in equity, their joinder as plaintiffs or defendants in one suit is not objectionable; but this is a very different question from that, whether, merely because many actions at law arise out of the same transaction or occurrence, and depend on the same matters of fact and law, all may proceed or be proceeded against jointly in one suit in chancery; and it is believed that it has never been so held, and never will be, in cases like those here involved. Where each of several parties may proceed in equity separately, they are permitted to unite, and make common cause against a common ad-

[Turner *et al.* v. City of Mobile.]

versary, and one may plead in one suit in equity many who are his adversaries, in a matter common to all in many cases, but never when the only ground of relief sought is that the adversaries are numerous, and the suits are for that not in itself a matter for equity cognizance. Attention to the distinction mentioned will resolve all difficulties in considering the many cases on this subject. There must be some recognized ground of equitable interference, or some community of interest in the subject-matter of controversy, or a common right of title involved, to warrant the joinder of all in one suit; or there must be some common purpose in pursuit of a common adversary, where each may resort to equity, in order to be joined in one suit; and it is not enough that 'there is a *community of interest merely in the question of law or of fact involved*,' etc., as stated by Pomeroy in § 268. Although he asserts that this early theory has long been abandoned, he fails utterly to prove it. * * * * If it is true, as stated by Pomeroy, and some quoting him, that mere community of interest in matters of law and fact makes it admissible to bring all into one suit in chancery, in order to avoid multiplicity of suits, all sorts of cases must be subject to the principle. Any limitation would be purely arbitrary. It must be of universal application, and strange results might flow from its adoption. The wrecking of a railroad train might give rise to a hundred actions for damages, instituted in a dozen different counties, under our law as to the venue of suits against railroad companies, in some of which executors or administrators, or parents and children might sue for the death of a passenger, and, in others, claims would be for divers injuries. If Pomeroy's test be maintained, all of these numerous plaintiffs, having a *community of interest in the questions of fact and law*, claiming because of the same occurrence, depending on the very same evidence, and seeking the same kind of relief (damages), could be brought before a chancery court in one suit to avoid multiplicity of suits! But we forbear. Surely the learned author would shirk from the contemplation of such a spectacle; but his doctrine leads to it, and makes it possible. * * * The cases

repudiating the doctrine contended for are numerous. We do not cite them, for it is unnecessary, in view of the fact that not a case has been found in England or America to sustain this bill." The same doctrine in substance has been declared in New Jersey, where it is held: "The court will not permit several plaintiffs to demand by one bill, several matters perfectly distinct and unconnected, against one defendant. ⁘　⁘　⁘　A bill filed by several complainants on behalf of themselves and all others, over whose land the Morris Canal and Banking Company have made their canal, who shall come in and contribute; charging that the defendants had entered on complainants' land, without permission or having purchased, or agreed for the same, and excavated their canal and done the complainants great damage, and that the company is insolvent and unable to pay, and praying that an account may be taken and damages awarded to the complainant for injuries already sustained, and compensation for the lands taken by the company decreed to them, and that an injunction may issue restraining the company from using or occupying the land, is multifarious, and on that account the injunction is refused. Where the demands of several complainants united in the same bill, are entirely distinct and independent; where there is no privity between them; no common interest in all the complainants, centering in the point in issue in the cause; no general right claimed by the bill and covering the whole case; no rights established in favor of complainants; and no demand made that the funds of the defendants shall be applied to the payment of complainants' claims after their adjustment; and where claims are not *in rem*, but *in personam*;—the bill cannot be sustained." In the course of the opinion Chancellor Vroom said: "There is no kind of privity between these complainants. There is no general right to be established as against this defendant, except the general right that a wrongdoer is liable to answer for his misdeeds to the injured party: which surely does not require to be established by such a proceeding as this. The utmost that can be said is that the defendant stands in the same relative position to all these complainants.

There is no common interest in them centering in the point in issue in the case; which is the rule in 2 Anst. 469a. Nor is there any general right claimed by the bill covering the whole case; which is the principle adopted by Lord REDESDALE. Chancellor KENT'S rule is quite as broad as any authority will warrant; but it is not broad enough for the case now before the court. It requires that a bill against [or by] several persons must relate to matters of the same nature, and having a connection with each other, and in which all the defendants [or complainants] are more or less concerned."—*Marseils et al. v. Morris Canal and Banking Co.,* 1 N .J. Eq. 31. In Adams Equity it is laid down that "in order to originate this jurisdiction [to prevent a multiplicity of suits] it is essential that there be a single claim of right in all arising out of some privity or relationship with the plaintiff." p. 200. "No bill of peace will lie where the rights and responsibilities of the defendants neither arise from, nor depend upon, nor are in any way connected with each other."—*Randolph v. Kinney,* 3 Rand. 394. Mr. Beach, in his work on Modern Equity Jurisprudence, lays it down that jurisdiction to the prevention of a multiplicity of suits does not obtain when there is no danger of numerous suits between the parties to the bill, "but only a possibility or probability that other persons not parties might bring other suits [or be sued] for the enforcement of rights asserted by [or against] them upon substantially the same basis."—§ 22; *Dyer v. School District,* 61 Vt. 96. This doctrine finds support in many well considered cases. In Connecticut, it is held that although numerous actions, each brought by or against a different party may be necessary under given circumstances, chancery will not interfere for the purpose of consolidating such actions and thereby preventing a multiplicity of suits, when no property right or franchise is held by such numerous parties in common and when no one of them could be injured by the multiplication of actions in which other persons only would be parties, though the right or defense relied upon by each, viz., to set aside or prevent the enforcement of an illegal assessment against each personally, is the

same.—*Dodd et al. v. Hartford*, 25 Conn. 232. So it is held in *Thomas v. Council Bluffs Canning Co. et al.*, 92 Fed. Rep. 422, that "the fact that the defendant might be subjected to a number of legal actions affords no ground for a resort to equity by a complainant where but a single action would be required to which he would be a party or in which he would have any interest;" and in the course of the opinion delivered by SANBORN, J., for the court of appeals, it is said: "The multiplicity of suits which confers jurisdiction in equity is a multiplicity of suits to which the complainant will be a party." To the same effect is *Lumber Company et al. v. Town of Hayward et al.*, 20 Fed. Rep. 422, where it is said: "Courts of equity cannot wrest jurisdiction from courts of law because there is more than one plaintiff severally interested in the controversy; and many actions by different plaintiffs where one action at law will settle the controversy as to each, is not what is intended by a multiplicity of suits. Here no one of the plaintiffs would have any interest in any suit brought by another, and no one can complain because others are compelled to sue [or are subject to suits, we interpolate] inasmuch as he could not be called upon to share in the vexation or expense. No one of the complainants stands in any danger of a multiplicity of suits affecting himself, and he cannot complain that some other person must have a suit in order to obtain that other person's legal rights. These cases come within the principle of *Cutting v. Gilbert*, decided by Judge NELSON in 5 Blatch. 259; *Dodd v. Hartford*, 25 Conn. 232; *Youngblood v. Sexton*, 32 Mich. 406, and *Barnes v. City of Beloit*, 19 Wis. 93." In *Insurance Co. et al. v. Mholman Co.*, 73 Fed. Rep. 66, it was ruled that "several actions commenced or threatened by the same plaintiff against different insurance companies which had issued policies on the plaintiff's property, and refused to pay losses thereunder, do not constitute a multiplicity of suits within the meaning of the law, authorizing the interference of equity, although the same defense is set up by each of the defendants; and an injunction will not be granted to restrain the commencement and prosecution of such actions, upon

a bill in the nature of a bill of peace, filed by all the insurance companies against the plaintiff in such actions." That case seems in principle to be on all fours with the case at bar, and one or two observations of Judge LACOMBE are extremely apposite here: "It is contended that the numerous authorities cited in the brief warrant the granting of such relief. In the opinion of this court, however, none of them go to that length; and if the drift of some be in that direction, it would seem to be a good time to call a halt. * * * The fundamental difficulty with complainants' position is that although there may be a multiplicity of actions from the point of view of the assured, who may have to sue each company, there is no multiplicity of actions from the point of view of the insurer, for no insurer is threatened with more than a single action." In a Michigan case the bill was filed to enjoin the collection from the several complainants of a personal tax assessed against them separately in respect to the business in which each was engaged, and upon the question whether the bill had equity, Judge COOLEY, delivering the opinion of the court, said: "If complainants rely upon the jurisdiction of equity to take cognizance of a controversy where thereby a multiplicity of suits may be prevented the reliance fails, because the principles that govern that jurisdiction have no application to this case. It is sometimes admissible when many parties are alike affected or threatened by one illegal act, that they shall unite in a suit to restrain it; and this has been done in this state in the case of an illegal assessment of lands.—*Schofield v. Lansing*, 17 Mich. 437. But the cases are very few and very peculiar where this can be permitted, unless each of the complainants has an equitable action on its own behalf. Now, the nature of this case is such that each of these complainants, if the tax is invalid, has a remedy at law which is as complete and ample as the law gives in other cases. He may resist the sheriff's process as he might any other trespass, or he may pay the money under protest, and at once sue for and recover it back. But no other complainant has any joint interest with him in resisting this tax. The sum demanded of

each is distinct and separate, and it does not concern one of the complainants whether another pays or not. All the joint interest the parties have is a joint interest in a question of law; just such an interest as might exist in any case where separate demands are made of several persons. Just a common interest there might be if several persons should give several promissory notes on distinct purchases of a worthless article; and such there might have been under the former prohibitory liquor law had demands been made against several persons for liquors illegally sold to them. We venture to say that it would not be seriously suggested that a common interest in any such question of law, where the legal interests of the parties were wholly distinct, could constitute any ground of equitable jurisdiction when the several controversies affected by the question were purely legal controversies. Suits do not become of equitable cognizance because of their number merely."—*Youngblood v. Sexton*, 32 Mich. 406, 410. In *Barnes v. Beloit et al.*, the effort was to enjoin an assessment which imported a lien on lots abutting a street, and the several lot owners united in the bill which was sought to be sustained under the equity of preventing or avoiding a multiplicity of suits. But the Supreme Court of Wisconsin denied this equity: "If the proceedings set out in the complaint are valid, then there is a lien on each lot separately, * * * ; if they are not legal then there may be an apparent cloud to the amount so assessed on each lot. Each plaintiff is interested only in removing this cloud from his own lots, not from the lots belonging respectively to his co-plaintiffs. Each and all may be interested in the question, for if one has a right to the aid of a court of equity to remove the cloud or enjoin the assessment as illegal, for the same reason and on the same evidence, each of the others might obtain the relief. But there is no such common pecuniary interest as authorizes them to unite in one suit as plaintiffs to obtain the relief asked. Each can sue alone and the others are not necessary parties. This is not an action respecting a common fund, nor to assert a common right, nor to restrain acts injurious to property in

which all the plaintiffs have a common interest or a common right." 19 Wis. 93. In *Cutting et al. v. Gilbert,* 6 Fed. Cases, 1070, a bill was filed by several brokers on behalf of themselves and of all other brokers similarly situated who should come in and make themselves parties, etc., to enjoin the collection of a license tax imposed on brokers; and its equity was sought to be maintained on the theory of preventing a multiplicity of suits. The court ruled against them. Judge NELSON, in the course of his opinion, said: "This is a bill of peace to quiet the rights of parties, and to put an end to further litigation. The bill is founded on the idea that all persons in business as brokers, charged with the tax in question, have such a unity or joinder of interest in contesting it, that all may join in the bill for that purpose; and that as the parties are so numerous as to make it inconvenient to join all of them a determinate number may appear in the name of themselves and for the rest. I have not been able to concur in this view. The interest that will allow parties to join in a bill of complaint, or that will enable the courts to dispense with all the parties, when numerous, except a determinate number, is not only an interest in the question, but one in common in the subject-matter of the suit; such as the case of disputes between the lord of a manor and his tenants, etc., etc. * * * In the case before me the only matter common among the plaintiffs, or between them and the defendants, is an interest in the question involved, which alone cannot lay a foundation for the joinder of parties. There is scarcely a suit at law, or in equity, which settles a principle, or applies a principle to a given state of facts, or in which a general statute is interpreted, that does not involve a question in which other parties are interested, as, for instance, the doctrine of trusts, and the statutes of descents, of frauds, of wills, and the like; yet no lawyer would contend that such an interest would justify the joinder of parties as plaintiffs, in cases arising under the law of trusts, or under any of the statutes mentioned. The same may be said of questions arising under the revenue laws, such

[Turner *et al.* v. City of Mobile.]

as the tariff and the excise laws, which are
the subject of litigation in the courts almost daily. Large
classes of persons other than parties to the suit are in-
terested in the questions involved and determined. To
allow them to be made parties to the suit would con-
found the established order of judicial proceeding, and
lead to endless perplexity and confusion." The doctrine
of this case has not only been approved by the Supreme
Court of the United States, but that part of the opinion
of Judge NELSON which we have quoted has been adopted
by that tribunal as its own opinion in the case of *Scott
v. Donald*, 165 U. S. 107, 115-16. With reference to a case
in which the bill was sought to be maintained in avoid-
ance of a multiplicity of suits, Judge INGRAHAM, in the
Supreme Court of New York, said: "Here the mul-
tiplicity of actions is against a multitude of people,
rather than against one person which equity in some
cases will prevent. A man having 100 promissory notes,
made by different individuals, might as well ask to sue
all of them in one action, because, if he had to bring 100
actions against the 100 individuals, he would be re-
quired to bring and maintain a multiplicity of suits."
*O'Brien v. Fitzpatrick et al.*, 39 N. Y. Sup. 707, 709.
Strictly analogous to the case at bar is that stated by
KENYON, M. R., in *Rayner v. Julian*, 2 Dick. 667, of the
sale of an estate in lots to different persons, in respect
of which it was declared that the vendor could not in-
clude all the purchasers in a bill for specific perform-
ance, as each party's case would be distinct and depend
on its own circumstances; and in *Brooks v. Lord Whit-
worth*, 1 Madd. 85, a demurrer for multifariousness on
that precise ground, was allowed. So it is well settled
that the several purchasers of distinct parcels of a landed
estate cannot unite in a bill against the common vendor
for specific performance of the contract of sale; and for
the same reason they cannot when they are sued sepa-
rately for deferred payments, join in a bill, on the theory
of prevention, or avoidance, or staying the further pros-
ecution of a multiplicity of suits, to enjoin the actions at
law and have their separate legal defenses thereto, albeit
such defenses all rest upon the same facts and legal prin-

[Turner *et al.* v. City of Mobile.]

ciples, as for instance a failure of consideration, decreed and effectuated in the one suit in equity. And the reason is that they have no common interest in the lands sold to them separately, nor in the prices they have severally agreed to pay—no common interest in the subject matter.

This court has never undertaken to define the jurisdiction of equity to prevent a multiplicity of suits, nor to lay down general principles from which the several categories of cases in which that jurisdiction may be invoked is possible of statement. All that has been decided or said by this court bearing on the subject evidences an inclination toward the confinement of this jurisdiction to a narrow field and a purpose to conserve in its full integrity the right of trial at law and by juries of the title to land.—*Hamilton v. Brent Lumber Co.*, 127 Ala. 78; *Ashurst v. McKenzie*, 92 Ala. 490; *Keller v. Bullington*, 101 Ala. 267; *Attalla Mining & Manufacturing Co. v. Winchester et al.*, 102 Ala. 184; *Moses v. Mayor of Mobile*, 52 Ala. 198; *Bowling v. Crook*, 104 Ala. 130. Certain it is that nothing that has been decided or said here affords any justification or warrant for the filing of a bill by the defendant in one action of ejectment, either in his own behalf alone, or in behalf of himself and the defendants in other ejectment suits prosecuted by the same plaintiff, to enjoin all the actions of ejectment on the sole ground that each of the ejectment defendants, although impleaded in respect of separate and distinct parcels of land, has an interest in common with all the others in the questions of law and fact involved in the action against the complainant: Nothing, in short, has ever been said or decided in this court giving any countenance to the proposition that a common interest in the questions at issue only will give to numerous parties so interested a standing in equity for the prevention of a multiplicity of suits. The intolerable consequences to which the recognition of such a doctrine would logically lead are sufficiently indicated in the cases to which we have referred. But putting that consideration aside, the doctrine contended for cannot be sustained on principle. It would seem to be an elementary and fundamen-

tal proposition that a party who seeks to come into
equity must himself have an equity. His equity may be
derivative: It may rest in him because of privity be-
tween him and others by force of contract or in estate.
But however it comes to him it must exist in him, or he
cannot maintain a bill. Where his title is legal, where
his defense is at law, where all his rights, remedies and
defenses are cognizable in a legal forum, and he, there-
fore, has in his own capacity and right no standing in
a court of chancery, it is altogether plain and clear to
us, Mr. Pomeroy and some courts to the contrary not-
withstanding, that the wholly fortuitous, accidental and
collateral fact that numerous other persons have like,
but entirely independent and disconnected, legal rights,
estates, or defenses, cannot upon any conceivable princi-
ple invest him with any right, legal or equitable, and that
his rights whatever they may be are precisely the same
as if no other person had similiar rights. It is palpably
illogical to say that one man may acquire rights of any
sort from others with whom he has absolutely no con-
nection or relation by blood, in estate or by convention.
It is a palpable *non sequitur* to say that when numerous
persons have like but independent legal estates or legal
rights in respect of which severally they have no right to
invoke the jurisdiction of chancery, yet because they are
numerous the separate legal right of each is metamor-
phosed into an equity right in all, or in one for all. Ju-
risdiction in equity is not entertained on any notion
that the *court has an equity*—that it will take jurisdic-
tion to prevent a multiplicity of suits in order to lessen
its own labors or those of other courts: The equity upon
which the invocation is made must reside in the party
making it. When numerous parties have each the same
equity they may in a proper case unite in one bill for its
declaration and effectuation. Each having the sepa-
rate right to come into equity upon an identical ground,
they will be allowed to come in together on the theory
of preventing a multiplicity of suits. So, where one
party is subjected to or threatened with numerous and
vexatious actions at law, or is the victim of numerous,
repeated and continuing wrongs so that a multitude of

suits would be necessary for his redress at law, he may come into chancery because the necessity for numerous suits or defenses to numerous suits at law is in itself such a wrong and vexation to him as vests him with an equity. But in the case we have on the aspect under consideration, there is confessedly no separate equity in the several defendants to the actions of ejectment; but the proposition is that while separately they are without equity yet their mere combination gives equity to the claim of each—that the mere existence in many persons of like legal rights create an equity in all. Here there is no vexation, imminent or threatened, against any one of these persons. There are no repeated and continuing wrongs being committed against any one of them. There is *only one* suit against any one of them, and no other than this one is threatened. *There is no multiplicity of suits against these complainants, or against any one of the numerous parties in whose behalf the bill is filed to be prevented, stayed or avoided.* If these complainants were allowed to proceed with this bill—if we were to accord them that equity by the sheer force of judicial power against all sound principle—it would not follow that any suit except that against them would be avoided or stayed. They have, we unhesitatingly conclude, no such equity. The bill could not be maintained for the prevention of a multiplicity of suits even if all the ejectment defendants were complainants in it; and *a fortiori* it cannot be maintained by the defendants in one of those actions in behalf of themselves and the others: It is without equity for the prevention of a multiplicity of suits.

The bill having no equity for the prevention of a multiplicity of suits, it follows that all legal rights, titles, or defenses of complainants which are attempted to be asserted by it are to be laid aside and eliminated from the further consideration of the case on the motion to dismiss the bill for want of equity. Thus, the assumption that the bill shows a want of title in the city of Mobile for that the State's title has not been vested in the city, and hence that the defendant has a legal defense to the action of ejectment, so far from giving complain-

[Turner *et al.* v. City of Mobile.]

ants a standing in equity, demonstrate the adequacy of their legal remedy and the consequent absence of any occasion to invoke the powers of the chancery court. On the other hand, assuming that the bill shows the legal title to be in the city, the complainants have no footing in equity unless they have made a case of estoppel against the city to assert its legal title; and whether the bill shows such equitable estoppel is now become the main question for decision.

Much has been said in argument as to complainants' status with respect to the shore resulting from their ownership of the upland abutting upon the shore; but it is not necessary to a disposition of this appeal for us to undertake to finally determine here precisely what that status is, or what rights in respect of or estate in that part of the shore in controversy it imports. If they have no rights in the shore referable to their ownership of the upland or to the uses they may have made or may be making of the shore in connection with the upland, they, of course, have presented no case of equitable cognizance, nor would they have any standing at law against an action of ejectment prosecuted by the owner of the shore.

But assuming that complainants owned the upland abutting on the shore lot for the recovery of which the city has sued, and by reason of such littoral proprietorship they have or had the right to wharf out across the shore lot, that right must rest or must have rested upon one of two conditions: It must be or must have been either a mere *parol license* to them to erect their wharves on and across the shore; or it must be or must have been something more than a mere parol license from the owner of land to another having no interest or rights in it to do something upon it, something in the nature of a right appurtenant to the upland conveying—not in itself the title to the shore lot since land itself cannot be held as appurtenant merely to land but—a qualified right under immemorial custom and usage to *extend their occupation* over the shore by the erection thereon and there across of wharves, piers and the like as means of commerce and aids to navigation.

If they had a mere parol license in the premises from the shore owner and were without other warrant than his

mere permission to occupy the shore with their structures, they had neither legal nor equitable claim thereto, even though and after they had actually taken possession of the shore lot and erected their marine structures upon it under such parol·permission: Such license is always revocable at the pleasure of the licensor, and it neither imports title of any sort in them, nor, even when acted upon, involves any matter of estoppel *in pais* against him.—*Hicks et al. v. Swift Creek Mill Co.,* 133 Ala. 411.

If, on the other hand, there is an immemorial usage and custom in Alabama, obtaining as to the shores of Mobile river and Mobile bay, recognized in the statute and organic laws of the State (Constitution 1868, § 26, Art. I; Constitution 1875, § 25, Art. I; Constitution 1901, § 24, Art. I; Act of December 8th, 1868, "To carry into effect Paragraph 26, Art. I of Constitution of Alabama," 1868 (Acts 1868, p. 394), now § 2514 of the Code; Act of February 18th, 1895 (Acts 1894-5, p. 992), now § 2784 of the Code; Act of 1854 and its amendment as afterwards ambodied in the charter of the city, authorizing Mobile to obtain by contract or purchase the property in or control over the wharves and wharf property in the city; Act of Assembly subjecting wharves of littoral proprietors to taxation; Act of February 28th, 1887, creating a Harbor Line Commission, etc., for the wharves of Mobile bay and river] according to littoral proprietors the right to wharf out across the shore as a right appurtenant to the ownership of the abutting uplands, and if the complainants have exercised this right by entering upon the subjacent shore lot and erecting thereon their piers, wharves, bulkheads or other structures whereby to reach and avail themselves of the navigable part of the water, and have thus extended their occupation to the shore and were in such occupation of the *locus in quo* at the time of suit brought by the city and have so remained, it is clear, we think, that they have an adequate and complete defense at law to the action of ejectment.—*Matten v. Chapman;* 40 Conn. 382, 395; s. c. 16 Am. Rep. 46 and notes; *East Haven v. Hemingway,* 7 Conn. 186, 202-3; *New Jersey*

*Zinc & Iron Co. v. Morris Canal & Banking Co.,* 44 N. J. Eq., 398, 401; *Stevens v. Patterson & Newark R. Co.,* 34 N. J. L. 532; *Gough v. Bell,* 2 Zab. (N. J.) 441; *Austin v. Rutland Railroad Co.,* 45 Vt. 215; *Hamlin v. Fairpoint Manufacturing Co.,* 141 Mass. 51, 57; *Norfolk City v. Cooke,* 27 Gratt. 430; *A. & F. R'y. Co. v. Faunce,* 31 Gratt. 761. The right in the shore which they had as appurtenant to their title to the upland under the conditions named was *to extend their occupation* over the shore lot, and if they have exercised this right and thus extended their occupation through the erection and user of wharves and other like structures, they have a possessory right which they can maintain at law.—*Miller v. Mendenhall,* 19 Am. St. Rep. 219, and notes, 231-2. Complainants' status in respect of the shore lot in controversy as owners of the abutting uplands necessarily comes within one or the other of the two categories we have stated. If it falls within the first, they have no rights at law or in equity which could subsist after a revocation of the license to them. If within the second, they have a defense at law against the city's action of ejectment. And the conclusion in this connection is that the invocation of chancery jurisdiction, so far as it is based upon their littoral rights, must be unavailing.

The Harbor Line statute *confers* no right upon the complainants. It may have a bearing upon their ultimate rights as a legislative recognition, along with other statutes, of the right of littoral proprietors to wharf out across the shore; and assuming such right by custom, it and the fixing of a harbor line under it would operate to determine the extent to which the wharves of complainants could be carried into the waters of the river or bay.

The fact that statutes of the State and ordinances of the city levy taxes on the complainants' wharves involves no matter of equitable estoppel upon the State or city to assert whatever legal title either may have to the shore lot upon which such wharves are located. There is no real inconsistency between governmental action of this sort and the assertion by government of the right to reoccupy the lot, if it is otherwise entitled to do so. While

the wharves are maintained and used by the complainants, they are as beneficial to them as if they owned in fee the land which supports them. Taxation is not imposed upon them as a price for their location and maintenance, but for the support of the government which protects the complainants in their possession and user for the time being; and the fact that the levy is specifically upon *wharves,* structures placed on the land, and not upon the land itself, evidences a legislative contemplation that the underlying land was held separately from the structures upon it, for otherwise there would have been no occasion for a specific levy on the structures. At most these statutes levying taxes on wharves is a legislative recognition that the structures taxed are rightfully located, but they in themselves involve no commitment of government to the continued maintenance and user of them.

One of the acknowledged heads of equity jurisdiction is trusts, it is quite true; but the mere fact that the legal title to land is in a trustee gives a disseisor no shadow of ground to come into a court of chancery to enjoin an action at law by the trustee for the recovery of possession.

We believe we have considered every ground upon which it is sought to be maintained that the bill has equity. We have found no merit in any of them; and we concur in the conclusion of the chancellor that the bill is without equity.

The chancellor granted the motion to dismiss for want of equity, but allowed time for opportunity to amend the bill so as to give it equity. In his opinion he said that the rule requiring the allowance of such opportunity was one which he did not "clearly understand, as all amendments are considered as made on a motion to dismiss." This is a very just observation. This court has departed from the rule referred to by the chancellor, in recent decisions, holding that dismissals on such motions should be final and absolute.

The decree rendered below will be here modified so as to eliminate its provisions for opportunity to amend, and, as modified, it is affirmed.