[Kellar v. Bullington.]

# Kellar v. Bullington.

*Bill in Equity to enjoin the Commission of Trespass.*

1. *Injunction; when granted to enjoin trespass.*—A court of equity will not grant an injunction to prevent the commission of trespasses, unless the complainant shows a satisfactory title to the *locus in quo;* and if the title be denied or in doubt, the injunction will be refused against the defendant who is in possession, until the title is established at law.

2. *Same.*—An injunction will not lie in favor of a complainant not in possession of the actual property trespassed upon, to restrain the removal of stone from lands of which the defendants had possession under a claim of ownership, when the complainant obtained title thereto from the Government by his entry as a homestead, until the disputed question of title has been adjudicated.

APPEAL from the Chancery Court of Colbert.

Heard before the Hon. THOMAS COBBS.

The facts of the case are sufficiently stated in the opinion.

L. B. COOPER, and ROULHAC & NATHAN, for appellant. The commission of the trespass *vel non* by the respondents in this case depended upon the validity of their claim of title to the property upon which the trespass was alleged to have been committed. A court of chancery had no jurisdiction to determine the issue, and the parties should have been remitted to a court of law for its determination. The case made by the averments of the bill was not such a one as would justify the granting of the injunction prayed for.—*Hambrick v. Russell*, 86 Ala 199, 5 So. Rep. 289; *Hooper v. S. & M. R. R. Co.*, 69 Ala. 537; *Armstrong v. Gilchrist*, 2 Johns. Cas. 424, 430-1; *People v. Chicago*, 52 Ill. 424, 428; 1 Pomeroy Eq. Jur., § 176; 1 High on Inj., (3d. Ed.), § 650; *Bell v. Chadwick*, 71 N. C. 329; *Sullivan v. Rabb*, 96 Ala. 442, 5 So. Rep. 746; *Jerome v. Ross*, 7 Johns. Ch. 315.

J. B. MOORE, *contra*, cited 9 Ala. 289; 21 Ala. 288; *Oaksmith v. Johnson*, 92 U. S. 343; *Farley v. Smith*, 39

Ala. 38 ; *Swann & Billups v. Lindsey*, 70 Ala. 507 ; *Iverson & Robinson v. DuBose*, 27 Ala. 418 ; 12 Wall. 92 and 103–4 ; *Blevins v. Cole*, 1 Ala. 212 ; *Street v. Nelson*, 80 Ala. 231 ; 95 Ill. 391 ; 1 Amer. & Eng. Encyc. of Law, 298.

HEAD, J.—On March 17th, 1884, Arthur H. Kellar purchased at the judicial sale of the lands of the estate of F. C. Vinson, deceased, made by R. B. Lindsey, the administrator, several hundred acres of land, in Colbert county, Ala., and after report and confirmation, and payment of the purchase money, received, on the 26th day of September, 1887, the deed of the administrator thereto. This sale and deed included the N. W. ¼ of the S. E. ¼ of section 23, township 5, range 11. The intestate, Vinson, had no title to this forty acres, but the same were public lands, the title of the government having never been divested. It is not shown when the report of this sale was made to the probate court by the administrator, and there is no evidence to show that Kellar acquired any color of title, until the execution of the administrator's deed on the 26th day of September, 1887, which was several months after the filing of the bill in this case ; but it is a fact, established by the pleadings and proofs without controversy, that from the time of his purchase in 1884, until the complainant's, Bullington's, entry hereinafter referred to, and for a while thereafter, he was ignorant of his want of title, believed he had a good title, and claimed the said forty acres as his own, under said purchase, and that his possession and acts of enjoyment hereinafter mentioned were, in fact, adverse to the world, under claim of ownership by virtue of his said purchase. Kellar owned a large body of lands adjacent and contiguous to the above forty. In the fall of 1886, he verbally sold to Hull a half interest in his lands. They contained valuable stone suitable for quarrying, and in November, 1886, stating the case most strongly for the complainant, by joint act and arrangement, they, Kellar and Hull, by themselves and employés, went upon said forty acres, believing the same to be their property under Kellar's purchase at said judicial sale and by his contract to sell a half interest to Hull, and began the work of opening a quarry. They erected the necessary buildings, did the grading for a side track to the railroad, opened the quarry and

entered upon the work of quarrying stone, expending about $500 in the preparatory work. This possession was continued, and business prosecuted without abatement, under the same claim of right and ownership, taking out and disposing of stone daily, until the service of the injunction in this cause on June 15th, 1887.

With this possession and enjoyment of the premises and claim of ownership in force, the complainant, Bullington, on the 1st day of February, 1887, entered, at the land office at Huntsville, as a homestead, the north half of south-east quarter of said section 23, township 5, range 11 west, which, it is seen, includes the said forty acres. The only averment in the bill of possession taken by complainant under this entry is in the following language: "Soon after his said entry thereof he built a dwelling house upon said lands, and moved his family into the same, and ever since thereof your orator and his family have resided on said lands and are now residing thereon, and occupying said lands as a homestead." His only proof of his possession is his testimony, as follows: "After I entered the land the 1st day of February, I moved on it the 11th day of March, 1887, and have lived on it ever since. I live about one quarter of a mile from said quarry." A few days after the entry, complainant notified Kellar and Hull of the same, and not to get any more stone off the land. They refused to submit to this demand, but continued working the quarry and claiming the land as before, and Kellar instituted, before the proper tribunal, a contest of the validity of the entry, and prosecuted the contest to its final determination in 1891, when the validity of the entry was adjudged. Whilst the complainant and respondents were thus arrayed against each other, each in the assertion of title to the land, the complainant, on June 14, 1887, filed this bill to enjoin the further commission of the alleged trespasses, and for an account and recovery of the value of the stone taken. The chancellor granted the relief prayed, and from his decree the respondents appeal.

It is clear the averments of the bill and the proof thereunder, taken in connection with other averments and proof, touching the possession complainant took after his entry, do not show that the actual adverse possession by respondents of the land they held was displaced

or disturbed by the possession which complainant took. The bill is not filed, concurrently with a real action at law to try the conflicting claims of title, in order to prevent the destruction of the estate, or irreparable waste and damage pending such a trial at law. In fact there is no averment or proof of facts from which it can be deduced that a virtual destruction of the estate, or injury thereto for which adequate redress can not be obtained in an action at law, would follow the continued possession and quarrying of stone by the respondents until an action at law could be tried. In the absence of averment and proof to the contrary, it must be assumed the respondents are solvent and able to respond in damages for the alleged trespasses. The bill seems to rest for its equity upon the mere conclusions of the pleader that a resort to equity is necessary to prevent irreparable injury and a multiplicity of suits, rather than any statement of facts to that effect. The register's report shows that from February 1st, 1887, to the service of the injunction. June 15, 1887, about 340 cubic yards of stone were quarried and disposed of. The value of this stone, as it lay in the bluff, is shown to have been about $34. Its value at the quarry, after being put in shape for shipment, was about $204, and at Sheffield, to where it was shipped and disposed of, $1,293. It is also manifest, from the evidence, that the quantity thus quarried, through a space of four and a half months, was insignificant, as compared with the practically inexhaustible supply in the quarry. The conclusion, therefore, from the facts, if there were averments to the contrary, would be that no destruction of the estate or irreparable injury would follow the assertion of complainant's legal remedies, without resort to injunction. A real action at law, to try the disputed question of title and for the recovery of damages and mesne profits, would serve to settle, in one action, the title to the land, and to award to plaintiff, if successful, all damages, not only for mesne profits, but for injuries committed in the nature of trespass or waste, (Code, Chap. 6, Title I, Part 3) ; and those damages are recoverable to the time of the trial.—Code, § 2716. See also *Cooper v. Watson*, 73 Ala. 252 ; *Beatty v. Brown*, 76 Ala. 267 ; Sedg. & Wait Trial. of Tit. to Land, § 668.

High, in his work on injunctions, discusses very fully the subject of injunction to prevent trespass. In section

[Kellar v. Bullington.]

698, he says : "To warrant relief  *   *   *   the party
aggrieved must show a satisfactory title to the *locus in
quo*, and, if the title be denied or in doubt, the injunc-
tion will generally be refused against a defendant in
possession until the title is established at law. But in a
strong case of irreparable mischief the rule has been
departed from. And where the party aggrieved is in
possession he will be allowed to restrain such trespasses
as would result in irreparable damage in the event of
refusing the relief. Equity will not, however, enjoin a
trespass to realty when plaintiff's title is in dispute and
has not been established at law, when no irreparable
injury is shown. And where defendants are in posses-
sion alike with plaintiffs of the premises in controversy,
and the title is doubtful and disputed, and it is not
shown that plaintiffs have taken any steps to establish
their title, and no reason is shown why they are not so
doing, they will be denied an injunction. In such case
a court of equity will not presume to determine the title
to the property upon affidavits, and will not permit a
temporary injunction to be granted which would operate
as an action of ejectment." "A fundamental doctrine,"
says the same author in section 699, "underlying the
entire jurisdiction of equity by injunction against the
commission of trespass is, that where adequate relief
may be had in the usual course of procedure at law, equity
will not interpose by the extraordinary remedy of injunc-
tion." And he sums up in section 701 in the following
language : "To warrant the interference of equity in
restraint of trespass two conditions must co-exist : first,
complainant's title must be established ; and, second,
the injury complained of must be irreparable in its
nature. And to come within the rule the injury must
be of such a nature as not to be susceptible of. adequate
pecuniary compensation in damages. Nor will equity
interfere to restrain a trespasser simply because he is a
tresspasser, but only because the injury threatened is
ruinous to the property in the manner in which it has
been enjoyed, and will permanently impair its future
enjoyment. And if the title to the *locus in quo* is in
doubt, the injunction, if allowed at all, should only be
temporary until the title can be determined at law." In
section 700, the author says, that to warrant interference
by injunction to prevent a multiplicity of suits, "there

must be different persons assailing the same right, and the principles upon which the relief is granted have no application to a repetition of the same trespass by one and the same person, the case being susceptible of compensation in damages."

In *Jerome v. Ross*, 7 Johns Ch. 315, canal commissioners being authorized by statute to enter upon any lands contiguous to the canals, and to dig for stone and other materials necessary for the prosecution of their work, dug up and removed stone from a ledge of rock on complainant's premises, who thereupon filed a bill for injunction. Chancellor Kent, finally disposing of the case, said : "The objection to the injunction in cases of private trespass, except under very special circumstances, is that it would be productive of public inconvenience, by drawing cases of ordinary trespass within the cognizance of equity, and by calling forth, upon all occasions, its power to punish by attachment, fine and imprisonment for a further commission of trespass, instead of the more gentle and common law remedy, by action and the assessment of damages by a jury. In ordinary cases, this latter remedy has been found amply sufficient for the protection of property ; and I do not think it advisable, upon any principle of justice or policy, to introduce the chancery remedy as its substitute, except in strong and aggravated instances of trespass which go to the destruction of the inheritance, or where the mischief is remediless." The complainant in that case was left to his remedy at law. It will be observed, too, in that case, that there was no question of complainant's title to the premises.

In the present case, as we have seen, respondents were in possession of the *locus in quo* claiming title, when complainant acquired his title by entry, and when he filed this bill. In the absence of some overruling equity, they had a constitutional right to have the validity of their claim of title tried in an issue to the country, before being disturbed in their possession and use of the premises. They were not obliged to yield to the mere notice and demand of an adverse claimant, although the superior title of such claimant may have appeared to be clear. They had the right to have the claimant put his title and their own to a legal test. There is scarcely ground for an argument that complainant was in danger

of suffering destruction of his estate, or irreparable injury thereto. There is not a shade of doubt, under the evidence, that if every yard of stone had been removed from his land, payment to him of the fair value thereof, in money, would have afforded ample and adequate redress. We have shown that such payment could have been enforced, and the title to the land settled in one action at law. There was, therefore, no necessity whatever for resorting to injunction.

The maxim, "*Nullum tempus occurit reipublicae*," has no application to this case. It is true there can be no adverse possession of land which can ripen into title against the government; and the doctrine of maintenance does not apply against it. Those are questions which pertain to the trial of the title when jurisdiction for that purpose has been properly invoked. Here the complainant has sought the wrong forum. In an action at law he may have the benefit of those immunities, if entitled to them.

Reversed and remanded.

