ALASKA DEVELOPMENT CO. v. BRANNAN
(No. 1519; March 5, 1929; 275 Pac. 115)

*S. E. Phelps,* for appellant.

110

*Curran & Cobb,* for respondent.

*S. E. Phelps,* in reply.

RINER, Justice.

This case is before us upon direct appeal from a judgment of the District Court of Natrona County entered after a trial to the court of issues, presented by pleadings summarized as follows:

The petition of the plaintiff, appellant here, after averring its corporate existence, its principal business place at Casper, and its occupation in the production of oil and gas, alleges that on October 1, 1925, and since that date it was and is entitled to "and is in the possession of" certain described real property in Natrona County, Wyoming; that it "is the owner of and was and now is in possession of, and entitled to the possession of" certain buildings on said land and certain valuable personal property originally located thereon suitable for drilling oil and gas wells; that on November 6, 1925, the defendant, respondent here, with other men, came upon the premises aforesaid, engaged in an altercation with plaintiff's employee in charge of said premises regarding the gas line there situated, injured the employee and forbade his return to the property, all without cause or right; that between November 8th and 20th, 1925, defendant committed other trespasses in entering said land and into plaintiff's buildings, taking and moving certain drilling equipment to a place upon this land where defendant was preparing to drill a well; that on November 20th, 1925, defendant's agents severed a gas line to its buildings from a gas well, previously sunk upon the land by plaintiff, so as to deprive plaintiff of the use thereof; that since November 30, 1925, defendant has been using gas and water from said well and been engaged in the drilling of other wells upon said premises without plaintiff's consent and without right, and despite its directions to defendant to keep off of the land and not to use the personal property aforesaid; that on December 6, 1925, plaintiff served a written notice upon defendant containing these prohibitions; that defendant will continue to enter upon the premises and drill wells unless restrained; that de-

fendant has no property in excess of the legal exemptions and several unsatisfied judgments are outstanding against him; that defendant's acts cast a cloud upon the right and title to the property which it is endeavoring to sell; that defendant is without financial means to drill successfully and case the well thus undertaken which work will be done so as to be a great detriment and cause irreparable damage to these premises and to plaintiff, and to other premises in the field, by allowing water to get into the gas or oil strata; that this threatened damage will involve plaintiff in contentions with its lessor and with the United States, the original lessor of the land; that no pecuniary damages can be assessed and collected from defendant and those cooperating with him for the injuries sustained by plaintiff through these acts of defendant; that on November 9, 1925, a criminal complaint was filed before a justice of the peace of Natrona County, charging defendant and others with breaking into plaintiff's buildings on these premises, and after a hearing the charge was dismissed; that plaintiff is unable to preserve and protect its rights in the premises. The relief asked is that defendant and his agents be restrained from trespassing on the property, from interfering with plaintiff's employee, from using any gas, oil or water from plaintiff's said well, or any of the personal property aforesaid, from further drilling of the well which defendant is engaged in sinking, and that defendant and his agents be required to return plaintiff's personal property to the place from which it was taken.

This petition was filed December 12, 1925, but no temporary injunction or restraining order was asked upon it, though it was positively verified. A second amended answer appears to have been filed December 26, 1926, which was replied to the following month. The case came on for trial early in July, 1927, and upon application of defendant, over plaintiff's objections, leave was given to file an amended and supplemental answer, which was done on the 5th of that month, its purport being as follows:

After interposing defenses consisting of a general demurrer to the petition, an averment that the court was without jurisdiction of the subject matter or the parties in the action, and that there was a defect of parties defendant and also a general denial of the allegations of the plaintiff's petition, it was set out that since November 1, 1925, defendant had been and is now in possession of the lands described in plaintiff's petition under a certain contract dated June 12, 1925, and entitled an "assignment" between plaintiff and defendant; that under its terms, defendant was and is entitled to the possession of the premises since November 1, 1925; that under and in conformity to the provisions of this contract, defendant took and retained possession of the lands; that he has actually drilled and completed two gas wells, as contemplated by the contract, to commercial production, and fully complied with each of the covenants and agreements in said contract; that plaintiff at all times knew of defendant's actions in taking over said premises, and that plaintiff's remedy is legal and is plain, speedy and adequate, being more so than the equitable remedy sought; that defendant has notified plaintiff of his compliance with all of the terms of the contract and is now entitled to have a conveyance to him of the property described therein as to be conveyed to him; that one C. L. Holden holds the permit for prospecting for oil and gas on the premises, and plaintiff has no interest in said permit, the latter being merged in an application for a lease pending or to be pending before the interior department of the United States, which has sole jurisdiction over said premises; that plaintiff has not now or has it ever had any interest or title to the premises and that these matters have arisen since joinder of issue; and that on November 26, 1926, plaintiff's interest in the property, if any, was cancelled by one Minal E. Young, assignee of said Holden, and that the rights of plaintiff to the property have been fully determined by the depart-

ment of the interior of the United States. It was prayed that plaintiff take no relief by its petition.

The same day a reply to this pleading was filed, in substance a general denial of the new matter set out therein. Upon the conclusion of the trial and after the presentation of oral and written argument, the court found generally in favor of the defendant, and a judgment against plaintiff that it take nothing was accordingly entered. The plaintiff brings this appeal from that judgment.

The parties being aligned here as they were below, they will be referred to as plaintiff and defendant respectively. The facts shown by the record and material to a proper disposition of the cause, as we view it, are these:

On April 7, 1921, the secretary of the interior of the United States issued to one C. L. Holden a prospecting permit for the period of two years from date, granting him the right to prospect for oil or gas upon all of the lands referred to in plaintiff's petition, these lands being a part of the public domain. This permit appears to have been subsequently extended to the year 1928, upon application for that purpose being made to the department of the interior. The permit required, among other things, the drilling of two wells, one the first year to the depth of 500 feet, and the other the second year to the depth of 2,000 feet, unless valuable oil or gas deposits were sooner discovered, required the wells to be drilled in accordance with approved methods and so as to preserve the property under the reasonable orders of the secretary of the interior, and invested the latter with power to cancel the permit for failure to comply with its conditions or to employ due diligence in the work of development.

Although on August 6, 1921, he had entered into an operating agreement with plaintiff relative to 160 acres of the lands included in this permit, on December 4, 1921, permittee Holden undertook to lease to one M. E. Young, agent, all the lands covered by this permit "under the same terms and conditions as set forth in said prospecting

permit from the United States." Other requirements as to royalties and other matters not material here were likewise included in the agreement. Thereafter and on April 20, 1922, M. E. Young, agent, and the plaintiff, executed an instrument wherein it was provided that the former "sub-leases and gives possession" to the latter of the lands covered by said permit and leased by Holden to M. E. Young, agent, with the exclusive right to develop said lands for oil or gas during the life of the permit and any lease granted thereunder. The agreement provided that plaintiff should fulfill on behalf of Young, agent, "all the conditions and requirements of the United States and the rules and regulations under the United States leasing law required in operation under said oil and gas permits," and also should fulfill all the conditions of the agreement between Holden and Young, agent, above mentioned. There were many other terms in the instrument, among which was a reserved right to Young, agent, to cancel the agreement upon its covenants being violated, the giving of fifteen days' written notice thereof to plaintiff and the latter's failure to comply with the requirements of the contract within said fifteen days.

During the years 1922 and 1923, plaintiff appears to have put down two wells upon these lands, but they were not drilled and cased in a manner acceptable to the United States geological survey officials, who supervised such matters for the interior department in the field, it being their opinion also that no commercial discovery of either oil or gas had been made in these wells. They were subsequently closed off, upon the order of the United States geological survey representatives.

Nothing further would seem to have been done by the interested parties relative to developing the gas or oil content of the lands until May 28, 1925, when four directors of the plaintiff appear to have signed some minutes of a directors' meeting authorizing plaintiff's secretary to make an "assignment" of its rights to "Chicago parties"

or others who could be interested for the development of the property aforesaid, the terms of such assignment not being particularly specified in the authorization, except that the defendant should be used as an intermediary, simply, through which plaintiff's rights in the property should be passed to the ultimate assignees.

June 10, 1925, an agreement for a limited partnership, designated the "Illinois Oil Company," was signed by two parties residing in the state of Illinois, and by the defendant and the wife of the secretary of the plaintiff, the last two being residents of Casper, Wyoming, she being named as the general partner and all the others special partners only. The following month additional statutory steps were taken to perfect the organization of the partnership. Under date of June 12, 1925, plaintiff and defendant signed a contract in terms an assignment, by the former to the latter, of all its right, title and interest in and to the aforesaid lands; the instrument also bargained, sold and assigned to defendant all its drilling and camp equipment and personal property on the premises except its records and office quarters. Defendant was obligated to drill two wells on these lands to a depth of 1,900 feet, unless gas or oil in commercial quantities was found at a lesser depth, the first of the wells to be drilled not later than December 31, 1925, and the second not later than August 1st, 1926; further it was specified that defendant should, in the event commercial production was accomplished by the wells, pay to plaintiff out of the production $65,525. The assignment additionally recited that the plaintiff was desirous of making it "in order that said land may be developed by" defendant. Though signed by defendant and by the plaintiff's president and secretary—two of the directors who had given the authorization already referred to—the instrument was completely silent as to the matter of the plaintiff being merely an intermediary in the transfer of the plaintiff's property and rights.

Under date of June 24, 1925, an instrument was executed by the defendant and the Illinois Oil Company, in form an assignment practically identical in phraseology with that given the defendant by plaintiff. On July 21, 1925, an "escrow agreement" was signed between plaintiff and defendant, it reciting, among other things, that in consideration of $65,000, to be paid plaintiff by defendant, it had assigned to him certain of the aforesaid acreage with all plaintiff's personal property except office buildings and equipment. It provided that defendant should receive the assignment only upon completion of two wells mentioned in that instrument and as provided therein; that the escrow agent should deliver said assignment to the defendant upon the completion of the two wells and on or before the completion of the second well, and not afterwards; that the assignment should be delivered to plaintiff's secretary in the event of defendant's failure to complete the wells. It was also provided that the terms of the escrow should be binding upon the assignees of the respective parties. No mention was made of any assignment by the defendant to the Illinois Oil Company, although the latter is recited as the party to bear the expense of the escrow arrangement.

It appears that these two so-called assignments—that from plaintiff to defendant, and the one from defendant to the Illinois Oil Company—were placed in the escrow agent's hands and have since remained there. During part of the summer months of 1925, the Illinois Oil Company seems to have endeavored to do something towards the development of the property, but by August of that year it became clear it would accomplish nothing. In the early part of the following September, plaintiff put its watchman, one Markland, in charge of the premises involved. This man appears to have previously had some personal difficulty with defendant and during the month of October, 1925, some disagreement seems to have arisen between defendant and the watchman concerning the possession of the

property. However, in the following month of November, the defendant began his preparations to sink a well upon these lands, and his preparations in that respect also resulted in several altercations with the watchman, in one of which the latter was somewhat injured. A criminal complaint based upon defendant's actions in this regard was filed in a justice court in Natrona county, and after hearing had, was dismissed. Defendant took and used some of the drilling equipment, casing and other personal property referred to in the assignment in escrow as the property of the plaintiff, as his need for them arose in the course of drilling. He employed his own tools. On November 27, 1925, defendant had commenced actual drilling operations. Plaintiff's watchman finally left the premises sometime in December of that year, as defendant had by then cut off the supply of gas to the cabin where the former stayed.

Under date of November 30th of the same year, the Illinois Oil Company, by its general partner, the wife of plaintiff's secretary, executed an assignment of all the property and rights it had received from defendant to the plaintiff. The latter, about December 6th following, served a written notice upon defendant to quit the premises and to surrender the personal property claimed by the plaintiff, which he had taken and used in his drilling operations. Oral notice by the watchman to the same effect had previously been given defendant. As the latter disregarded these notifications, and asserted possession and the right to possession of the property, this action was started on December 12th, as already indicated.

The defendant seems to have continued his drilling operations without interference until the latter part of January, 1926, when he completed his first well on the disputed premises. Shortly thereafter he began the drilling of his second well thereon, which was completed April 19, 1926. A representative of the United States geological survey testified that these wells were properly drilled and protected, and afforded commercial production. June 15,

1926, demand to deliver the assignment to defendant was sent by United States registered mail to the escrow agent and to plaintiff, defendant claiming full compliance with the escrow agreement of July 21, 1925. This demand was never recognized. Defendant, as a witness, stated that there was no arrangement whereby he was simply to act as intermediary between plaintiff and the Illinois Oil Company, and claimed the assignment in his own right. Plaintiff's witnesses disputed this. There was evidence also that Young, agent—and in passing it may be noted that the latter testified that he, personally, was the real party in interest, and that the term "agent" affixed to his name in the several contracts was merely employed pursuant to an arrangement with others which was never consummated —had undertaken a forfeiture of the plaintiff's rights in the property under the fifteen-day notice clause already referred to, and that the department of the interior of the United States had, by formal decision, declined to recognize plaintiff as having any interest in the lands in question.

In the view we take of the record before us, it will not be necessary to examine specifically the numerous assignments of error argued by appellant. A number of them relate to the admission of evidence claimed to be irrelevant and incompetent. As the trial was to the court, this was not prejudicial, as we see it, in the case at bar. See Yount v. Strickland, 17 Wyo. 526, 533, 101 Pac. 942, 944; Williams v. Yocum, 37 Wyo. 432, 263 Pac. 607, 611. It will be recalled from the resume of the pleadings given above, that this is a suit for an injunction to restrain alleged repeated trespasses to property claimed by both plaintiff and defendant, both of whom assert that they are in possession and entitled to the possession and right of possession thereof, and for a mandatory injunction to direct the return of certain personal property, likewise claimed by both plaintiff and defendant. There are several legal principles applicable to suits of this character which may here be properly mentioned. Preliminary to such an examination,

it may not be amiss to remark that although the form of actions and suits and the distinction between actions at law and suits in equity has been abrogated by our civil code in this state, a party to entitle himself to the equitable remedy of injunction must still make such a case as would, while the distinction prevailed, have made an equitable cause of action. The Troy etc. Co. v. the Boston etc. Co., 86 N. Y. 107, and cases cited. With this elementary proposition before us, we note that in Lewis and Spelling on Injunctions, page 126, it is said:

"And, in conclusion under this head, may be stated the general rule that injunction will not lie to obtain possession of real estate where the circumstances do not render inadequate the plaintiff's ordinary legal remedies, such as ejectment and forcible entry and detainer."

32 C. J. 35, with an extended list of cases cited in the note, amplifies this rule thus:

"Where complainant's right is doubtful or his title is in dispute, a perpetual injunction cannot be obtained until the doubt is removed by a proper proceeding and the right made certain."

14 R. C. L. 450, Sec. 150, shortly puts the rule thus:

"It may be stated as a general rule that an injunction will not ordinarily be granted unless the complainant's title has been either admitted or established by a legal adjudication."

The opinion in the case of Roy v. Moore, 85 Conn. 159, 82 Atl. 233, approving an excerpt from an earlier decision of the same court, remarked:

"Unquestionably the interference of a court of equity by injunction, in a case of trespass to land, and when an action at law will lie, is of modern origin, and an exercise of power to be justified only in a case of great and irreparable injury. Doubtless, too, the petitioner who invokes it,

in conformity with principle and precedent, should show at least a strong *prima facie* case of a right. In the earlier cases the title was not in dispute, and in the later ones, when it has been, and has been doubtful, the court have refused to interfere. In Roath v. Driscoll, 20 Conn. 533, 52 Am. Dec. 352, this court said that they would not interfere when the right was doubtful; and to that principle we adhere."

Quoting from High on Injunctions, the case of Kellar v. Bullington, 101 Ala. 267, 14 So. 466, uses this language:

" 'To warrant the interference of equity in restraint of trespass two conditions must co-exist: First, complainant's title must be established; and second, the injury complained of must be irreparable in its nature. And to come within the rule the injury must be of such a nature as not to be susceptible of adequate pecuniary compensation in damages. Nor will equity interfere to restrain a trespasser simply because he is a trespasser, but only because the injury threatened is ruinous to the property in the manner in which it has been enjoyed, and will permanently impair its future enjoyment.' "

Discussing the use of injunction in trespass cases, the Missouri Court of Appeals, in the decision of Boeckler v. Missouri etc. Co., 10 Mo. App. 448, said this:

"A court of equity will never grant an injunction to restrain a trespasser upon real property merely because he is a trespasser; the trespass threatened and committed must be of a nature permanently to injure or destroy the inheritance, or otherwise inflict such irreparable mischief as is not susceptible of adequate compensation by way of pecuniary damages. * * * Nor do we think this is a case for this relief on the ground that the trespass is continuous in its nature. We agree with the learned judge of the Circuit Court, in the opinion delivered by him, that 'the continuous character of the trespass is a fact to be regarded, but it is not sufficient in itself, without other circumstances, to authorize injunctive relief.' It is obvious that if this were not so, any continuing dispossession by a trespasser would authorize an injunction, and the remedy would thus become a complete substitute for ejectment."

In Hall v. Henninger, 145 Iowa 230, 121 N. W. 6, 139 Am. St. Rep. 412, referring to several preceding cases on the subject, the court adopts their language and states its conclusions thereon to the following effect:

" 'It is sufficient to say that defendant is in possession under a claim of right, and that plaintiff has not the possession of the property. Courts of equity will not in such cases attempt to adjudicate the title or right of possession.' In another case this court has said: 'Courts of equity will under certain circumstances interfere by injunction to prevent trespasses upon real estate, but to authorize such interference there must exist some distinct ground of equitable jurisdiction, such as the insolvency of the party sought to be enjoined, the prevention of waste or irreparable injury, or multiplicity of suits.' Council Bluffs v. Stewart, 51 Iowa, 385, 1. N. W. 628. And to the same effect, see Minn. & St. L. R. Co. v. Chicago, M. & St. P. R. Co., 116 Iowa 681, 686, 88 N. W. 1082.

"This seems to be the uniform rule not only in this state, but elsewhere.''

The leading case of Jerome v. Ross, 7 Johns. Ch. (N. Y.) 315, 11 Am. Dec. 484, wherein the opinion was written by Chancellor Kent at the zenith of his powers and immediately preceding his judicial retirement, treats of the subject before us in these pertinent words:

"The objection to the injunction in cases of private trespass, except under very special circumstances, is that it would be productive of public inconvenience, by drawing cases of ordinary trespass within the cognizance of equity, and by calling forth upon all occasions its power to punish by attachment, fine and imprisonment, for a further commission of trespass, instead of the more gentle common law remedy by action, and the assessment of damages by a jury. In ordinary cases, this latter remedy has been found amply sufficient for the protection of property, and I do not think it advisable, upon any principle of justice or policy, to introduce the chancery remedy as its substitute, except in strong and aggravated instances of trespass, which go to the destruction of the inheritance, or where the mischief is remediless.''

In Howard v. Western etc. Co., 138 Md. 46, 113 A. 574, we find it said:

"The extraordinary process of injunction is never granted for the decisive and permanent enforcement of a right which is involved in reasonable doubt. It has been definitely and repeatedly held that when an injunction is sought as a primary, and not as a mere auxiliary, remedy, and the title relied upon is contested upon grounds which do not appear to be unsubstantial, the court will not decree such relief until the title has been established in a forum more appropriate to the determination of such an issue."

Where there was an application for a mandatory injunction to remove parties from the real estate of applicant upon which they had forcibly and wrongfully entered and were wrongfully occupying, in Warlier v. Williams, 53 Nebr. 143, 73 N. W. 539, the court affirmed the ruling below dismissing the action, and said in part:

"A litigant cannot successfully invoke the extraordinary remedy of injunction to enforce a legal right unless the facts and circumstances in the case are such that his ordinary legal remedies are inadequate; that is, that the pursuit of those remedies, or some of them, will not afford him as prompt and efficacious redress as the remedy by injunction. This we understand to be elementary law. Richmond v. Railroad Co., 33 Iowa 422; Jerome v. Ross, 7 Johns. Ch. 315, 11 Am. Dec. 484; Pom. Eq. Jur. Secs. 221, 275, 1346, 1347, 1357. Now, the facts stated in the petition of the plaintiff in error show simply this: That the defendants in error have forcibly entered upon, and are occupying, his real estate. The plaintiff in error has the legal title, and is in possession of this real estate. He might then institute against these defendants in error an action of forcible entry and detainer, under Chapter 10 of the Code of Civil Procedure, Section 1020 of which expressly provides that such an action may be brought against a defendant who is a settler or occupier of lands, without color of title, and to which the complainant in the forcible detainer suit has the right of possession. Here, then is a plain statutory remedy for the wrong of which the plaintiff in error complains in this action."

In Casper Wyoming Theaters Co. v. Rex Investment Co., 37 Wyo. 357, 261 Pac. 908, this court considered a situation practically the converse to that presented in the Warlier case, supra. In the course of our opinion in that case we said:

"An injunction cannot be used to take property out of the possession of one and give the possession to another."

And certain appropriate language from the case of Black v. Jackson, 177 U. S. 361, 20 Sup. Ct. 652, 44 L. Ed. 801, was quoted with approval. The opinion in the federal decision last mentioned adopts also the statement of the law contained in Lacassagne v. Chapuis, 144 U. S. 119, 124, 12 Sup. Ct. Rep. 659, 661, 36 L. Ed. 368, as follows:

"The plaintiff was out of possession when he instituted this suit, and by the prayer of this bill he attempts to regain possession by means of the injunction asked for. In other words, the effort is to restore the plaintiff by injunction to rights of which he had been deprived. The function of an injunction is to afford preventive relief, not to redress alleged wrongs which had been committed already. An injunction will not be used to take property out of the possession of one party and put it into that of another. * * * The plaintiff has a full, adequate, and complete remedy at law, and the case is not one for the jurisdiction of a court of equity."

The legal profession of this state is quite familiar with the fact that our civil practice code is in the main taken from the code of the state of Ohio. In Spangler v. City of Cleveland, 43 O. S. 526, 3 N. E. 365, the court said:

"For a perpetual injunction the courts require that there should be no doubt in the case, and that the plaintiff must make out a clear and unexceptionable right. Dan. Ch. 1681.
" 'Courts will not exercise this necessary authority when the right is doubtful or the facts not definitely ascertained.' Burnham v. Kempton, 44 N. H. 92.

" 'The right must be clear.' Bonaparte v. Camden and Amboy R. R. Co., 1 Bald. 218, Fed. Case No. 1617."

See also Reed v. Wellman, 104 Nebr. 292, 177 N. W. 170; Munyos v. Fillmore, 4 Ind. Terr. 619, 76 S. W. 257; Potts v. Hollon, 177 U. S. 365, 20 S. Ct. 654, 44 L. Ed. 808.

Applying the rules declared by these authorities to the undisputed facts shown in the record in the case at bar, and also to the facts that we must take as established under the general finding of the court in favor of the defendant pursuant to well known principles governing appellate procedure, we are of the opinion that the plaintiff made no case for the issuance of a permanent injunction. To say the least, plaintiff's right to the continued possession of the premises is very much in doubt from several viewpoints. The land is government land and subject to the United States' laws relating thereto, as well as the administrative powers of the department of the interior. Final action upon an application under the original permit for the issuance of a lease by the department, involving possibly its complete refusal of a lease relative to these lands so far as plaintiff is concerned, does not appear to have been taken, as we understand this record. What that action will be, or what parties will be finally recognized by the department, can only be determined when the latter concludes the proceedings which seem to be before it. Again, the conflicting claims of the parties as to possession and the right of possession of the premises in dispute, as based upon the several instruments executed by them and their actions thereunder, cast another serious element of doubt upon the plaintiff's right to the peculiar relief it seeks at this time.

The plaintiff's claim of prospective irreparable damage to the premises is quite disproved by the record. Indeed the proof shows, as we have seen, that the defendant put down two wells, which were properly drilled and protected, and which attained commercial production — matters wherein plaintiff itself had previously utterly failed. It

would appear that defendant's action has in that respect complied with the terms of the government prospecting permit, to which all of the parties to this record must look for their permanent rights, and so has been a real and substantial benefit to the property and to them. The intimation that defendant is insolvent is, we think, equally without foundation. True, he admits some outstanding, unsatisfied obligations against him, but he seems to have had resources sufficient to enable him to drill two commercial gas wells upon this land—hardly to be regarded as an inexpensive proceeding. He claims title to these wells, and if through a proper proceeding plaintiff should be awarded possession of the premises, and defendant's claim thereto adjudged without right, there is no proof before us which indicates that plaintiff's alleged damages would not be fully met by the extremely valuable improvements he has placed upon the land.

As regards the personal property in controversy, in the language of the first paragraph of the syllabus which accurately reflects the decision in Jones v. MacKenzie, 122 Fed. (C. C. A., 8th Cir.) 390: ''When the title to personal property of ordinary character is in dispute, and the title asserted by the respective parties is a strictly legal title, the remedy of the party out of possession is at law, by an action of replevin, and he cannot maintain a suit in equity to establish his ownership.'' See also High on Injunctions, (3rd Ed.), Sec. 28, 32 C. J. 135; Moore v. Steelman, 80 Va. 331; Cumberland etc. Lumber Co. v. Allen & Co., 6 Ky. L. Rep. 741, 746. Especially should this principle be applied where the title to the personal property is so seriously in dispute as it is here.

So far as the matter of avoidance of multiplicity of suits may be urged in this case, the language of the Federal Supreme Court in Boise etc. Co., Limited v. Boise City, 53 L. Ed. 796, 213 U. S. 276, 29 Sup. Ct. Rep. 426, is quite apropos, where it was remarked:

"Where the multiplicity of suits to be feared consists in repetitions of suits by the same person against the plaintiff for causes of action arising out of the same facts and legal principles, a court of equity ought not to interfere upon that ground unless it is clearly necessary to protect the plaintiff from continued and vexatious litigation."

In Lloyd v. Catlin Coal Company, 210 Ill. 460, 71 N. E. 335, this language was used:

"Each trespass is a new and distinct cause of action, usually dependent upon its own facts, and ordinarily, where the damages are of such character that they may be estimated in money and compensation awarded, equity will refer the parties to their action at law. The rule is stated by Chancellor Kent thus: 'A court of equity will sometimes interfere to prevent a multiplicity of suits by a bill of peace. (Citing authorities.) But that is only in cases where the right is controverted by numerous persons, each standing on his own pretentions, and it has no application to the case of one or more persons choosing to persevere in acts of trespass in despite of suits and recoveries against them.' Jerome v. Ross, 7 Johns. Ch. 335, 11 Am. Dec. 484. And to the same effect are Chicago Public Stock Exchange v. McClaughry, 148 Ill. 372, 36 N. E. 88, and Chicago General Railway Co. v. Chicago, Burlington & Quincy Railroad Co., 181 Id. (Ill.) 605, 54 N. E. 1026. The cases where equity will enjoin to prevent a multiplicity of suits between two persons, only, are where the whole controversy arises out of the same matter and has been settled at law, and further litigation, which seems purely vexatious, is persisted in."

We are not at all convinced from the facts shown by this record that the remedy by injunction is clearly necessary to protect plaintiff from continued and vexatious litigation. So far as we can see, a single action properly brought should determine the matters in dispute. What we have said herein is without prejudice to any legal rights the parties may have to be invoked in due form.

Our conclusion being that the District Court properly adjudged that plaintiff take nothing by its suit for the peculiar relief demanded, its judgment is, accordingly, affirmed.

*Affirmed.*

BLUME, C. J., and KIMBALL, J., concur.